WIENER, Circuit Judge:
Defendants-Appellants, all officials of the Louisiana Department of Social Services (collectively “LDSS”), appeal from the district court’s denial of their motions to dismiss on grounds of sovereign immunity (sometimes, “Eleventh Amendment immunity”) a complaint brought against LDSS by Plaintiff-Appellant Janice Kaz-mier under the Family and Medical Leave Act (“FMLA”).[1] As we conclude that the particular provisions of the FMLA that are at issue in the instant case do not validly abrogate the State of Louisiana’s sovereign immunity, we reverse and remand with instructions to dismiss Kazmier’s action.
I
Facts and Proceedings
Kazmier was fired by LDSS after she took several weeks leave during 1995: She took at least one month of leave beginning in May of 1995 after breaking her arm in a bicycling accident, and took at least one more week of leave at the beginning of October 1995 to care for her terminally ill father. In addition, after breaking her wrist later that month, Kazmier failed to return to work for the rest of the calendar *523 year. As a result of Kazmier’s absences, LDSS terminated her employment on January 4,1996.
Kazmier filed suit against LDSS in federal district court early in 1997, alleging that LDSS’s termination of her employment violated several provisions of the FMLA. LDSS filed a motion to dismiss, contending that Kazmier was barred by the Eleventh Amendment from prosecuting her suit in federal court. The United States intervened on Kazmier’s side, arguing that the FMLA validly abrogates the States’ Eleventh Amendment immunity. The district court denied LDSS’s motion to dismiss, and this appeal followed.
II
Analysis
The Eleventh Amendment is rooted in the principle, imprecisely stated in its text but implicit in the federal structure of the Constitution, that the federal courts do not have jurisdiction to hear suits brought by private individuals against nonconsenting States.[2] This jurisdictional bar is not, however, absolute: The States’ sovereign immunity can be abrogated by Congress pursuant to its enforcement power under Section 5 of the Fourteenth Amendment.[3] The validity of a purported abrogation is assessed judicially by applying a two-part test: First, “Congress must unequivocally express[] its intent to abrogate the immunity”;[4] and, second, Congress must act “pursuant to a valid exercise of power.”[5]
Kazmier contends that the FMLA validly abrogates the States’ Eleventh Amendment immunity, making LDSS amenable to suit in federal court. Conceding ar-guendo that in enacting the FMLA Congress unequivocally expressed its intent to abrogate such immunity, LDSS insists that Congress failed to effect the intended abrogation pursuant to a valid exercise of power. Thus, the only issue before us is whether Congress’s intent to make the pertinent provisions of the FMLA applicable to the States was validly enacted into law pursuant to Congress’s enforcement power under Section 5 of the Fourteenth Amendment.
Section 1 of the Fourteenth Amendment states that “[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.”[6] Section 5 of the Fourteenth Amendment provides that “[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article.”[7] Kazmier and the United States argue that the FMLA is a valid congressional enforcement of the Fourteenth Amendment’s guarantee that “[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws.”
“It is for Congress in the first instance to determine whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment, and its conclusions are entitled to much deference.”[8] The Supreme Court has noted, however, that “the same language that serves as the basis for the affirmative *524 grant of congressional power also serves to limit that power.”[9] “Congress cannot decree the substance of the Fourteenth Amendment’s restriction on the States.... It has been given the power ‘to enforce,’ not the power to determine what constitutes a constitutional violation.”[10] Thus, Congress’s exercise of its Section 5 enforcement power is always authorized when enacting strictly remedial legislation that narrowly targets clearly un constitutional State conduct.[11] In contrast, Congress can enact broad prophylactic legislation that prohibits States from engaging in conduct that is constitutional only when there is “a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.”[12]
The Supreme Court’s recent decision in Kimel v. Florida Board of Regents [13] provides the clearest guidance for determining whether legislation that purports to enforce the Fourteenth Amendment’s Equal Protection Clause against the States is “congruent and proportional.” A two part test emerges from Kimel. At the first step, we begin our analysis by determining what type of constitutional violation the statute under review is designed to prevent. The outermost limits of Congress’s potential authority to enact prophylactic legislation is directly linked to the level of scrutiny that we apply in assessing the validity of discriminatory classifications of the targeted type. If legislation “prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection ... standard,”[14] the legislation will not be considered congruent and proportional. Thus, Congress’s authority is most broad when “we require a tight[] fit between [the discriminatory classifications in question] and the legitimate ends they serve,” as we do with classifications that are based on race or sex.[15] Conversely, congressional authority is most narrow when Congress tackles discrimination on the basis of classifications that are not constitutionally suspect: “States may discriminate on the basis of [such classifications] without offending the Fourteenth Amendment if the ... classification in question is rationally related to a legitimate state interest.” [16]
Having established, at Kimel’s first step, the limits of Congress’s 'potential authority under Section 5, we examine, at Kimel’s second step, the legislative record of the statute under review to see whether it contains evidence of actual constitutional violations by the States sufficient to justify the full scope of the statute’s provisions.[17] The respect that must be accorded the States as independent sovereigns within our federal system prevents Congress from restraining them from engaging in constitutionally permissible conduct based on nothing more than the mere invocation of perceived constitutional bogeymen: Legislation that abrogates immunity must be proportional with and congruent to an identified pattern of actual constitutional violations by the States.[18] If Congress “fail[s] to [include in the legislative record of a prophylactic statute any evidence of a] significant pattern of uncon *525 stitutional discrimination” by the States, then the statute will not be held to abrogate the States’ sovereign immunity.[19]
A. Scope of Review
Section 2612(a)(1) of the FMLA[20] entitles eligible employees to take leave totaling twelve weeks per calendar year:
(A) Because of the birth of a son or daughter and in order to care for such son or daughter;
(B) Because of the placement of a son or daughter with the employee for adoption or foster care;
(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.
Kazmier has alleged that her employment with LDSS was terminated because she took leave (1) to care for her terminally father and (2) to recuperate from personal injuries. Consequently, of the section’s four justifications for leave under the FMLA, only subsections (C) and (D) are implicated in the instant case.
As subsections (C) and (D) clearly authorize leave on different substantive grounds, logic dictates that each must be subjected to an independent “congruence and proportionality” analysis. Although we have been unable to locate any case law expressly addressing the issue of sever-ability in the context of congruence and proportionality analysis,[21] we discern no reason why the provisions of one of the FMLA’s subsections could not validly abrogate the States’ Eleventh Amendment immunity even if the provisions of some or all of the remaining subsections fail to do so. We shall therefore evaluate the congruence and proportionality of subsections (C) and (D) separately.
B. Subsection (C)
This subsection requires employers to permit each eligible employee to take some or all of his 12 weeks FMLA annual leave to provide care for family members suffering from serious health conditions. .Congress’s express intent in enacting this provision, was to prevent employers from granting such leave discriminatorily on the basis of sex.[22] Specifically, Congress was responding to findings that private sector employers frequently discriminate against men in granting leave to provide family care.[23] Testimony before Congress indicated that the perverse effect of this reverse discrimination has actually been to push women out of the work force, largely because such discrimination is both rooted in and reinforces the stereotype that women will assume the role of the primary family care-giver. According to the testimony before Congress, such ster *526 eotypes make employers less willing to hire women because of the expectation that women will take significantly more leave time to care for members of their families than will men.[24]
Discrimination on the basis of sex is subject to “heightened” constitutional scrutiny.[25] Sexual classifications are constitutional only if they serve “important governmental objectives and ... the discriminatory means employed are substantially related to the achievement of those objectives.”[26] Thus, Congress potentially has wide latitude under Section 5 to enact broad prophylactic legislation designed to prevent the States from discriminating on the basis of sex.
The mere invocation by Congress of the specter of sex discrimination, however, is insufficient to support the validity of legislation under Section 5, at least when the statute at issue prohibits the States from engaging in a significant amount of conduct that is constitutional. Broad, prophylactic legislation must be congruent with and proportional to actual, identified constitutional violations by the States.[27] Yet in enacting the FMLA, Congress identified no pattern of discrimination by the States with respect to the granting of employment leave for the purpose of providing family care. Congress did make findings of such discrimination in the private sector, but such evidence is not imputable to the public sector to validate abrogation: The Supreme Court ruled in Kimel that findings of private sector discrimination do not create an inference that similar discrimination has occurred in the public sector.[28] Simply put, we will not infer from private sector conduct that the States are wilfully violating their constitutional duty to refrain from engaging in sex discrimination.
It is indisputable that Subsection (C) constitutes broad, prophylactic legislation: There is nothing in the Constitution that even closely approximates either a duty to give all employees up to twelve weeks of leave per year to care for ailing family members or a right of an employee to take such leave. In fact, as the legislative record for this provision is devoid of evidence of public sector discrimination, there simply are no identified constitutional violations to which the provision could possibly be “congruent and proportional.” If subsection (C) were solely remedial in nature, the absence of evidence of constitutional violations might not present a problem. But the provisions of this subsection are, instead, prophylactic in nature, purporting to prohibit the States from engaging in a broad swath of conduct that is not per se violative of the Equal Protection Clause.[29] We conclude, therefore, that Congress did not validly enact subsection (C) pursuant to its enforcement power under Section 5; that subsection (C) does not effectively abrogate the States’ Eleventh Amendment immunity; and that Kazmier cannot en *527 force that subsection against the State of Louisiana in federal court.[30]
C. Subsection (D)
This subsection requires employers to permit each eligible employee to take some or all of his 12 weeks FMLA annual leave to address the employee’s own “serious health conditions.” Congress’s express intent in enacting this provision was to prevent employers from discriminating on the basis of temporary disability.[31] The legislative record contains the additional suggestion that Congress meant for this provision to prevent discrimination against women on the basis of pregnancy-related disability as well.[32] Kazmier and the United States argue that this latter concern indicates that, like subsection (C), subsection (D) is ultimately designed to prevent discrimination on the basis of sex.
As an initial matter, we reject the notion that subsection (D) targets sex discrimination. The legislative record demonstrates that Congress was concerned with discrimination on the basis of pregnancy, which is not the same thing as broad based discrimination on the basis of sex. The Supreme Court has held that discrimination on the basis of pregnancy does not violate the Equal Protection Clause.[33] To the extent that subsection (D) targets such discrimination, it does not fall within Congress’s enforcement powers under Section 5 of the Fourteenth Amendment.
The United States asserts that even though subsection (D) expressly targets only discrimination in the granting of employment leave, the provision was nevertheless intended to have the secondary effect of preventing employers from engaging in discriminatory hiring practices. Specifically, the United States asserts that Congress enacted subsection (D) in response to evidence indicating that employers often are reluctant to hire women because of “the assumption that women will become pregnant and leave the labor market.” [34] The United States asks us to infer from Congress’s consideration of this evidence that even if subsection (D) is not designed to prevent discrimination on the basis of sex in the granting of leave, it is nevertheless designed to prevent discrimination on the basis of sex in the making of hiring decisions.
This argument is flawed on a number of levels. First, we note that, of Section 2612(a)(l)’s four justifications for leave, subsection (A) is the one that most plausibly is designed to combat pregnancy-related discrimination, as that subsection entitles employees to take leave “[b]ecause of the birth of a son or daughter and in order *528 to care for such son or daughter.” Second, to the extent that subsection (D) does target discrimination related to pregnancy, the argument advanced by the United States appears impermissibly to conflate discrimination on the basis of pregnancy with discrimination on the basis of sex, an approach that, as we already have noted, has been rejected by the Supreme Court.[35]
Ultimately, however, we need not delve too deeply into the true nature of the targeted discrimination, as we find it virtually impossible to conceive how requiring employers to permit employees to take 12 weeks of leave for serious health conditions could possibly have the effect of preventing sex discrimination in hiring practices. If the United States is correct in surmising that employers are reluctant to hire women for fear that they will become pregnant and “leave the labor market,” then the only possible effect on hiring practices of expressly mandating leave for pregnancy (among other serious health conditions) would be to reinforce such fears and make employers even more reluctant to hire women. A provision mandating that employers grant leave for serious health conditions cannot be viewed as reasonably calculated to achieve the objective of making employers less disinclined to hire women. Again, therefore, we reject the notion that subsection (D) is designed to combat sex discrimination.
What is patently clear, though, is that subsection (D) was designed by Congress to prevent discrimination on the basis of temporary disability.[36] Unlike discrimination on the basis of sex, however, discrimination on the basis of disability is subject only to the slightest of scrutiny under the Equal Protection Clause.[37] States may discriminate on the basis of disability without offending the Fourteenth Amendment as long as the classification in question is rationally related to a legitimate state interest.[38] In this respect, disability discrimination is similar to age discrimination, so subsection (D) is properly subject to the kind of analytical approach employed by the Supreme Court in Kimel to determine whether the Age Discrimination in Employment Act (“ADEA”) validly abrogates State sovereign immunity.[39]
Even a cursory look makes clear that, like the ADEA, the FMLA “prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard.”[40] It would not, for example, be unconstitutional for a State to permit its employees to take only eight weeks leave per year because of serious health conditions. For that matter, it would not be unconstitutional for a State to allow its employees no health related leave time at all, as long as in doing so the State applied the rule on a nondiscriminatory basis. In sum, subsection (D) prohibits the States from engaging in such a wide array of perfectly constitutional practices that we have difficulty conjuring up any unconstitutional conduct by the States to which that subsection’s proscriptions might possibly be proportional and congruent.[41]
*529 We need not engage in such counterfac-tual speculation, however, to resolve the instant case. The legislative record for the FMLA is devoid of any evidence of a pattern of discrimination by the States against the temporarily disabled; and the public sector cannot be tarred with the brush of private sector discrimination to create an inference of unconstitutional discrimination by the States.[42] “Congress’ failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field.”[43] Without direct evidence of substantial unconstitutional discrimination by the States, there simply is no “Fourteenth Amendment evil” to which subsection (D) could possibly be congruent and proportional.[44] We conclude, therefore, that Congress did not validly enact subsection (D) pursuant to its enforcement power under Section 5; that subsection (D) does not effectively abrogate the States’ Eleventh Amendment immunity; and that Kazmier cannot enforce that subsection against the State of Louisiana in federal court.
As a final point, we reject the argument advanced by Kazmier and the United States that, by stare decisis, our holding in Coolbaugh v. State of Louisiana[45] to the effect that Title II of the Americans with Disabilities Act of 1990 (“ADA”)[46] does validly abrogate the States’ Eleventh Amendment immunity, controls our decision today with respect to the validity of Congress’s abrogation of State sovereign immunity by enacting subsection (D). As an initial matter, we note that the continuing validity of Coolbaugh has been called seriously into question by the Supreme Court’s subsequent decision in Kimel which, in holding that Congress did not validly abrogate State sovereign immunity in enacting the ADEA, reversed another panel decision from this Circuit.[47] The Coolbaugh panel appears to have inferred a pattern of unconstitutional discrimination by the States from evidence in the ADA’s legislative record pertaining solely to discrimination in the private sector, an inference that the Court in Kimel made clear is impermissible. We need not re-examine the holding of Coolbaugh in detail, however, because the ADA is an entirely different statute than the FMLA, with its own distinguishable substance and its own distinguishable legislative record. For present purposes we need observe only that the legislative record of the FMLA, lacking any evidence whatsoever of unconstitutional discrimination by the States, will not support abrogation of State sovereign immunity, at least not with respect to those of the FMLA’s prophylactic provisions that are at issue in this case. Coolbaugh therefore does not proscribe our concluding that, like subsection (C), subsection (D) was not validly enacted pursuant to Congress’s enforcement power under Section 5 of the Fourteenth Amendment and therefore does not abrogate the States’ Eleventh Amendment immunity.[48]
Ill
A Response to the Dissent
The extensive research that has obviously gone into the dissent, and the scholarly work that it has produced, merit a brief response. The dissent chides us for *530 “Iookfing] at Boeme and all of the prior [Eleventh Amendment] jurisprudence through the wrong end of Kimel’s perspective glass.”[49] It then attempts to reinterpret the Supreme Court’s recent Eleventh Amendment jurisprudence through the antient lens of Chief Justice Marshall’s 1819 opinion in McCulloch v. Maryland.[50] The thrust of the dissent’s argument is that the “congruence and proportionality” test employed by the Supreme Court in Kimel, City of Boeme, and Florida Prepaid is in actuality nothing more than a “rational basis” standard of review.[51] The dissent contends that if we conclude that the FMLA is rationally related to deterring sex discrimination (which the dissent apparently concludes it to be),[52] we are obligated to uphold the validity of its purported abrogation of State sovereign immunity.
The dissent’s approach to Eleventh Amendment jurisprudence is not supported by the law, and even as a matter of legal theory it is riddled with problems. The dissent contends that “Kimel and [City of] Boeme reaffirmed and did not limit or replace the McCulloch ‘rational means’ standard.” In reality, however, McCulloch is nowhere mentioned in Kimel, and City of Boeme merely cites McCulloch for the well-established and universally accepted truism that “[ujnder our Constitution, the Federal government is one of enumerated powers.”[53] Indeed, the Court did not use the phrases “rational means” or “necessary and proper” even once in either of those two opinions. Simply put, McCulloch has absolutely nothing to do with the Supreme Court’s recent Eleventh Amendment jurisprudence: Chief Justice Marshall’s interpretation of the Necessary and Proper Clause was certainly a landmark decision with far-reaching implications, but it sheds no useful light on the difficult and intractable problems entailed in reconciling Congress’s enforcement powers under Section 5 of the Fourteenth Amendment with the bedrock principles of State sovereign immunity embodied in the Eleventh Amendment.
Moreover, the dissent’s contention that the Supreme Court’s congruence and proportionality test amounts to nothing more than a rational basis standard of review just cannot be right. First, the Supreme Court is well accustomed to using a rational basis standard of review in testing the validity of legislation;[54] if that is the only yardstick that the Court meant to apply in the context of the Eleventh Amendment, it would not have gone to the trouble of articulating a separate congruence and proportionality test. Second, neither the ADEA (the statute at issue in Kimel) nor RFRA (the statute at issue in City of Boeme) can be fairly characterized as irrational, yet the Court struck down both of those statutes after applying its congruence and proportionality test. It could not be clearer that congruence and proportionality is a considerably more stringent standard of review than is rational basis. Indeed, these two tests bear *531 little resemblance to one another, as they are rooted in entirely separate clauses of the Constitution.[55] Professor Laurence Tribe might agree with the dissent, which cites several of his pre-Kimel articles, but the support of even so prominent an academician is an inadequate substitute for rigorous adherence to recent Supreme Court precedent.
At its close, the dissent argues that the legislative record compiled by Congress in enacting the FMLA contains sufficient evidence of unconstitutional discrimination by the States to support abrogation of State sovereign immunity with respect to 29 U.S.C. § 2612(a)(1)(C) and (D). Despite scouring what it admits to be nine years of legislative history, the dissent is able to point to only six statements made during congressional hearings, which, it contends, demonstrate that in enacting Subsections (C) and (D) Congress was attempting to redress a pervasive pattern of sex-based discrimination that existed in the public sector at the time that the FMLA was enacted. Even a cursory review of those six statements, however, reveals that they are not in the least probative of the question before us. Every single one of the six quotations relates solely to the issue of parental leave, an issue that is not addressed by Subsections (C) and (D) of the FMLA and that we have expressly declined to address and rule on in deciding the case before us. Further evidence of the unpersuasiveness of the six statements is the fact that one of them deals solely with discrimination in the private sector;[56] one of them deplores the absence of robust parental leave policies in the public and private sectors, but without making any mention whatsoever of sex-based discrimination in the granting of such leave;[57] a third actually lauds the public sector for making parental leave readily available to employees, contending that the public sector has set an example that the private sector should emulate;[58] and a fourth, which was made during a hearing held in 1987 and which asserted that at that time — 13 years ago — the State of Florida granted its employees maternity leave but not paternity leave, was no longer true when the FMLA was enacted in 1993, by which time Florida had already enacted a general parental leave policy available to both sexes on a neutral basis.[59] Whether *532 the two or three remaining anecdotal and outdated statements on which the dissent is left to rely would be sufficient to support abrogation of State sovereign immunity with respect even to legislation pertaining to parental leave is thus subject to considerable doubt: -In Kimel, the Supreme Court explained that its ruling in City of Boeme was rooted in its conclusion that “Congress had uncovered only ‘anecdotal evidence’ [of discrimination by the State] that, standing alone, did not reveal a ‘widespread pattern of religious discrimination in this country.’”[60] We note again, however, that the validity of the FMLA’s parental leave provisions is not at issue in this case. Today we hold only that Congress failed to present sufficient evidence of unconstitutional discrimination by the States to support abrogation of State sovereign immunity with respect to Subsections (C) and (D), both of which the dissent fails to address squarely.
In fact, the dissent devotes no analysis at all to Subsection (D): Although it baldly declares that it cannot agree “that the legislative record for this provision is devoid of evidence of public sector discrimination against the temporarily disabled as this was precisely what the PDA and then the FMLA were enacted in response to,”[61] the dissent does not support its disagreement by pointing to any evidence pertaining to such discrimination by the States. Indeed, as the temporarily disabled are not a constitutionally suspect class, the dissent’s own analysis would seem to indicate that Subsection (D) is entitled to substantially less deference than are the other sections of the FMLA.[62] Unfortunately, the dissent’s total failure to analyze Subsee- ' tions (C) and (D) individually precludes a more detailed response to the positions that it takes.[63]
In the end, the dissent’s citations to the legislative record only serve to reinforce our conclusion that the FMLA is not designed 'to prevent discrimination at all, but rather is crafted to provide employees throughout the nation with a substantive statutory right to take leave from work for . family and medical reasons. The dissent has managed to find but two potentially relevant remarks — stray ones at that— pertaining to discrimination in the public sector, each of which was made offhand, does not appear to have been solicited by Congress, and is greatly overshadowed by the .speaker’s plea that Congress enact a statutory right to parental leave. In fact, in several instances the congressional testimony cited by the dissent emphasizes the paramount importance of maternity leave as distinguished from paternity leave, ironic indeed considering the dissent’s attempt to use this testimony to demonstrate that Congress’s primary concern was that family and medical leave be dispensed on a non-discriminatory basis.[64]
*533 Although the dissent clearly agrees with the substantive goals that Congress was trying to achieve in enacting Subsections (C) and (D), the wisdom of individual policy decisions is irrelevant to determining the validity of congressional abrogation of State sovereign immunity. Because of the dissent’s failure to acknowledge this basic legal principle, as well as the reasons discussed above, we find the dissent unconvincing.
IV
Conclusion
In light of the foregoing analysis, the district court’s denial of LDSS’s motion to dismiss must be reversed and the case remanded with instructions that both the official and the individual capacity claims against the named defendants be dismissed for lack of jurisdiction.[65]
REVERSED AND REMANDED, with instructions.

. 29 U.S.C. §§ 2601 etseq.

. See, e.g., Kimel v. Florida Board of Regents, 528 U.S. 62, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000) ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States”).

. 120 S.Ct. at 644.

. Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

. Id.

. U.S. CONST, amend. XIV, § 1.

. U.S. CONST, amend. XIV, § 5.

. Kimel, 120 S.Ct. at 644 (citations omitted).

. Id (quotations and citations omitted).

. Id (quotations and citations omitted).

. Id (quotations and citations omitted).

. Id (quotations and citations omitted).

. 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

. Kimel, 120 S.Ct. at 647.

. Kimel, 120 S.Ct. at 646.

. Id.

. City of Boerne v. Flores, 521 U.S. 507, 531, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank, 527 U.S. 627, 119 S.Ct. 2199, 2207, 144 L.Ed.2d 575 (1999).

. Kimel, 120 S.Ct. at 648-50.

. Id. at 647.

. 29 U.S.C. § 2612(a)(1).

. We do note, however, that in a recent decision the Eleventh Circuit chose to analyze the validity of the FMLA's purported abrogation of State sovereign immunity on a subsection-by-subsection basis. See Garrett v. University of Alabama, 193 F.3d 1214 (11th Cir.1999).

. The FMLA’s statement of purpose reflects that one of its primary purposes is to "minimize[ ] the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for ... compelling family reasons, on a gender-neutral basis.” 29 U.S.C. § 2601(b)(4).

. See The Parental and Medical Leave Act of 1987: Hearings on S.249 Before the Subcommittee on Children, Families, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, Part 2, 100th Cong. 536 (1987) (Statement of Professor Susan Deller Ross, Georgetown University Law Center) ("[T]here are a number of studies ... in which it’s shown that employers in this country that are giving family leaves to their workers are not giving it non-discriminatorily, they are, by and large, giving it only to women, not to men. It’s fairly flagrant discrimination.”)

. See The Family and Medical Leave Act of 1991: Hearing on S.5 Before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 102d Cong. 10 (1991) (Statement of Senator Adams) ("[T]he reality today is that women are the primary caregivers for elderly parents.... It is the daughters, whether biological or through marriage, that account for the majority of caregivers.”).

. See United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

. Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (citation omitted).

. See City of Boerne, 521 U.S. at 531-32, 117 S.Ct. 2157; Florida Prepaid, 119 S.Ct. at 2207; Kimel, 120 S.Ct. at 648-50.

. Kimel, 120 S.Ct. at 649 ("Finally, the United States' argument that Congress found substantial age discrimination in the private sector ... is beside the point. Congress made no such findings with respect to the States.”).

. It would be perfectly constitutional, for example, for a State to provide employees with only eight weeks of leave per year to provide family care.

. See Sims v. University of Cincinnati, 219 F.3d 559 (6th Cir.2000) (reaching the same result).

. See H.R.Rep. No. 99-699, Part 2, at 25 (1986) (“[A] worker who has lost a job due to a serious health condition faces future discrimination in finding a job which has even more devastating consequences for the worker and his or her family.”); Family and Medical Leave Act of 1989: Hearing on S.345 Before the Subcommittee on Children, Family, Drugs, and Alcoholism of the Senate Committee on Labor and human Resources, 101st Cong. 26-27 (1989) (testimony of Ms. Barbara Hoffman, Vice President of the National Coalition for Cancer Survivorship) (stating that the "disparate treatment" of cancer survivors "includes dismissal, demotion, and loss of benefits” and that “[sjuch discrimination against qualified employees costs society millions of dollars in lost wages, lost productivity and needless disability payments”).

. See 29 U.S.C. § 2601(a)(6) ("[Ejmployment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender.”).

. Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974).

. See The Parental and Medical Leave Act of 1986: Joint Hearing on H.R. 4300 Before the Subcommittee on Labor-Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor, 99th Cong. 36, 42 n. 48 (1986) (excerpt from brief of the American Civil Liberties Union).

. See Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974).

. We note that pregnancy does fall within the definition of disability that is supplied by the statute, as pregnancy is a serious health condition that may affect the ability of an employee to perform work.

. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313, (1985).

. Id. at 442, 105 S.Ct. 3249 ("[W]e conclude for several reasons that the Court of Appeals erred in holding mental retardation a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation.”).

. 29 U.S.C. §621 et seq.

. Kimel, 120 S.Ct. at 647.

. See id. at 645 ("Initially, the substantive requirements the ADEA imposes on state and local governments are disproportionate to any unconstitutional conduct that conceivably could be targeted by the Act.”).

. Id. at 649 (“CT]hat Congress found substantial ... discrimination in the private sector ... is beside the point. Congress made no such findings with respect to the States.”).

. Id. at 650.

. Florida Prepaid, 119 S.Ct. at 2207 (citation and quotations omitted).

. 136 F.3d 430 (5th Cir.1998).

. 42 U.S.C. §§ 12131-12165 (1994).

. See Scott v. University of Mississippi, 148 F.3d 493 (5th Cir.1998), overruled by Kimel, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

. See Hale v. Mann, 219 F.3d 61 (2d Cir.2000) (reaching the same result).

. Dissent at 522-23.

. 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

. Although the dissent accuses us of obstructing coherent dialogue by conflating rational means review with rational basis review, the dissent fails to articulate any substantive difference between rational basis review and the standard that it proposes. Rather than fence with the ghost of the dissent’s imagined standard, we have labeled the dissent’s approach "rational basis review” in an attempt to lend it an established framework of substantive content.

. We note in passing that the FMLA does not directly prohibit sex discrimination at all. For example, under the FMLA it would be perfectly permissible for an employer to grant 15 weeks of leave per year to female employees while granting only 12 weeks of leave per year to males.

. 521 U.S. 507, 516, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

. See, e.g., McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

. "Rational basis” review is an equal protection standard rooted in Section 1 of the Fourteenth Amendment, whereas the “congruence and proportionality” test defines the outermost limits of Congress's enforcement powers under Section 5 of the Fourteenth Amendment.

. See S.Rep. No. 103-3, at 14-15, U.S. Code Cong. & Admin. News at 17 (presenting statistics relating to parental leave for "employees working in private business” and a survey of "253 U.S. corporations”).

. See Parental and Medical Leave Act of 1986: Hearings on H.R. 4300 Before the Subcomm. On Labor Management Standards, 99th Cong., 30, 147 (testimony of Meryl Fran, Director of the Yale Bush Center Infant Care Leave Project, deploring the fact that "American women have no statutory right to parental leave”).

. See Parental and Medical Leae Act of 1987: Hearings on S.249 Before the Subcomm. On Children, Family, Drugs and Alcoholism, 100th Cong., 338 (testimony of Gerald McEn-tee, International President, American Federation of State, County, and Municipal Employees, that "one conclusion which can be drawn is that a vast number of employees in the State and local government sector already have the right to take unpaid parental leave or maternity leave for periods in excess of 18 weeks. Ninety percent of the employees covered in the sample, or 650,000 people, already had the right to a leave of four months or more. Clearly, parental leave is a fact of life in the public sector- And if government at all levels can live with unpaid parental leave, then so can private industry.”).

. See Fl. St. § 110.221 (1991) (providing parental leave "for the father or mother of a child who is born to or adopted by that parent.”). The fact that Florida changed its parental leave policy in 1991 to make leave available to parents of both sexes indicates that other testimony relied on by the dissent, stating that in 1989 13 states granted family leave to women but not to men, was similarly outdated and unreliable by the time that the FMLA was enacted in 1993.

. 120 S.Ct. at 644-46, citing City of Boerne, 521 U.S. at 531, 117 S.Ct. 2157.

. Dissent at 548-49 (internal quotation marks omitted).

. See Dissent at 536-38 (noting that Congress is entitled to substantially less deference in enacting prophylactic legislation that is purportedly designed to prevent discrimination on the basis of classifications that are not constitutionally suspect).

. The dissent appears to take the position that we must either uphold or strike down the FMLA in its entirety, despite the fact that only two of its four substantive provisions are at issue here. See Dissent at 544-45. The dissent cites no authority for its position,- even though it would require breaking with both the Second and Eleventh Circuits. See Garrett, 193 F.3d 1214 (11th Cir.1999), Hale, 219 F.3d 61 (2d Cir.2000). Moreover, the dissent's all-or-nothing approach would give Congress virtually unlimited authority to pass clearly unconstitutional provisions merely by tacking them onto statutes that are otherwise constitutional, a result that simply cannot be right.

.See, e.g., Parental and Medical Leave Act of 1987: Hearings on S.249 Before the Subcomm. On Children, Family, Drugs and Alcoholism, 100th Cong., 365-70 (testimony of Elaine Gordon, Member of the Florida House of Representatives, stating that "[t]here must be come official commitment to acknowledging motherhood as a societal function and stating that those who combine work and childbearing shall not be penalized,” and noting that to *533 that end she had “introduced a bill relating to maternity leave ... proposing] to extend maternity leave beyond state employees and encompass all employees, public and private''); Parental and Medical Leave Act of 1986: Hearings on H.R. 4300 Before the Subcomm. On Labor Management Standards, 99th Cong., 30, 147 (testimony of Meryl Fran, Director of the Yale Bush Center Infant Care Leave Project, deploring the fact that "American women have no statutory right to parental leave” and making reference to a study she conducted researching the availability of parental leave to women only).

. The claims brought against the defendants in their individual capacities must be dismissed for lack of subject matter jurisdiction because it is clear that the State of Louisiana is the real party in interest. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest.... [T]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.”) (citations omitted).