**Carron Leigh Williams
BRYANT Plaintiff**

v.

**MISSISSIPPI STATE UNIVERSITY
Defendant**

**No. 1:03 CV 577–D–D.**

United States District Court,
N.D. Mississippi,
Eastern Division.

July 20, 2004.

Mary A. Connell, Mayo Mallette, PLLC, Oxford, MS, for Defendant.

Jim D. Waide, III, Waide & Associates, PA, Tupelo, MS, for Plaintiff.

## OPINION GRANTING MOTION TO DISMISS

DAVIDSON, Chief Judge.

Presently before the Court is the Defendant's motion to dismiss.  Upon due con-

sideration the Court finds that the motion shall be granted.

### A. Factual Background

The Plaintiff was employed by the Defendant for four years as a medical technologist. On June 6, 2003, the Plaintiff was injured in an automobile accident. As a result, the Plaintiff was absent from work from June 6–10 and June 17–20, 2003. The Plaintiff was placed on paid leave of absence from June 23–27, 2003. The Plaintiff was terminated on June 27, 2003.

The Plaintiff's claim is based upon the Family and Medical Leave Act ("FMLA" or "Act"). 29 U.S.C. §§ 2601 et seq. The Plaintiff asserts that she was terminated in violation of the FMLA's subsection that allows an employee leave from work when medically necessary. 29 U.S.C. § 2612(a)(1)(D). The Plaintiff is seeking damages stemming from the alleged FMLA violation along with reinstatement to her former position.[1]

The Defendant has filed a motion to dismiss arguing that the Eleventh Amendment bars the Plaintiff's FMLA claim. In support of its position, the Defendant relies primarily on the Fifth Circuit's holding in Kazmier v. Widmann, 225 F.3d 519 (5th Cir.2000). Conversely, the Plaintiff insists that the Supreme Court's holding in Nev. Dept. of Human Res. v. Hibbs, 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003), directly overruled Kazmier.

### B. Standard for Review

A motion to dismiss under federal rule 12(b)(1) is employed to test the jurisdiction of the court. Pursuant to the federal rules of civil procedure, whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. Fed.R.Civ.P. 12(h)(3). Of course, at any time the court may of its own volition examine potentially deficient subject matter jurisdiction. Burge v. Parish of St. Tammany, 187 F.3d 452, 465–66 (5th Cir. 1999). Dismissal should not be granted unless it appears certain that there is no set of circumstances that would entitle the Plaintiff to relief. Benton v. U.S., 960 F.2d 19, 21 (5th Cir.1992).

### C. Discussion

#### 1. FMLA

The Family and Medial Leave Act of 1993 allows eligible employees to take up to twelve weeks of unpaid leave annually

(A) Because of the birth of a son or daughter and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1). The Act creates a private cause of action "against any employer in any Federal or State court of competent jurisdiction" who would "interfere with, restrain, or deny the exercise of" an employee's rights under the FMLA. 29 U.S.C. §§ 2617(a)(2), 2615(a)(1).

1. The Plaintiff's complaint also included a claim for violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq.; specifically, the Plaintiff alleged that she was not compensated for seventy-seven hours of work. In her response to the motion to dismiss, the Plaintiff concedes that her FLSA claim is barred by the Eleventh Amendment.

## 2. Development of Case Law

■ The Fifth Circuit held in *Kazmier* that FMLA's family-care subsection 2612(a)(1)(C) and self-care subsection 2612(a)(1)(D) did not validly "abrogate the States' Eleventh Amendment immunity." 225 F.3d at 526. In reaching this conclusion, the court utilized a bifurcated approach to analyze the constitutionality of the Act's subsections, rather than invalidating the Act's applicability to the states entirely. *Kazmier*, 225 F.3d at 525–27. The court found that inclusion of the family-care clause, subsection (C), was not based on any demonstrable evidence of public sector discrimination, and hence, was not a valid exercise of congressional power. *Id.* at 526. Additionally, the court held that there is no "evidence of a pattern of discrimination by the states against the temporarily disabled," thus, there is no "evil to which subsection (D) could possibly be congruent and proportional." *Id.* at 529.

Afterwards, the Supreme Court, recognizing a split among the Courts of Appeals, decided *Hibbs*, 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953. *Hibbs* mentioned *Kazmier* to demonstrate the split of authority as to whether an "individual may sue a State for money damages in federal court for violation of 2612(a)(1)(C)." *Hibbs*, 538 U.S. at 725–26, 123 S.Ct. 1972. Affirming the Ninth Circuit's interpretation, the court held that subsection (C), the family-care provision, "is congruent and proportional to its remedial object" and, therefore, validly abrogates states' immunity. *Id.* at 740, 123 S.Ct. 1972.

The Defendant supports its motion by suggesting that *Hibbs* overruled *Kazmier's* holding only as to the family-care provision of the FMLA. In other words, the Defen-

dant narrowly construes *Hibbs'* holding to read that the FMLA validly abrogates states' immunity only with regard to subsection (C), family-care, leaving the validity of the self-care provision, subsection (D), unresolved. The Defendant's interpretation is based, in part, on the Tenth Circuit's post-*Hibbs* decision in *Brockman v. Wyo. Dept. of Family Serv.*, 342 F.3d 1159 (10th Cir.2003).

Facing factual circumstances similar to the case *sub judice*, the *Brockman* court held that subsection (D), self-care, was not implicated by the *Hibbs* decision. 342 F.3d at 1164. The court then determined that "Congress did not effect a valid abrogation of state sovereign immunity" regarding the inclusion of the self-care provision. *Id.* at 1165. The Tenth Circuit correctly noted that the result reached in *Hibbs* "rested squarely on the 'heightened level of scrutiny' afforded gender discrimination." *Brockman*, 342 F.3d at 1164. Distinguishing the two cases, the *Brockman* court found that the family-care clause was intended to combat gender discrimination, but no such justification could sustain the self-care clause. *Id.*

The Plaintiff offers that the *Hibbs* decision effectively overruled *Kazmier's* holding. Noticeably absent from the Plaintiff's response is any reference to the Tenth Circuit's *Brockman* holding. Criticizing the Defendant's argument as "Clintonesque parsing," the Plaintiff further interprets *Hibbs* as a providing blanket abrogation of states' immunity where the FMLA is implicated. For support, the Plaintiff points to *Toeller v. State of Wis. Dept. of Corr.*, 296 F.Supp.2d 946 (E.D.Wis.2003).

In *Toeller*, one of but a few post-*Hibbs* decisions[2], the plaintiff brought suit

**2.** Another post-*Hibbs* case is *Montgomery v. Maryland*, No. 02–1998, 72 Fed.Appx. 17 (4th Cir. July 30, 2003) (plaintiff sued for violation of FMLA's self-care clause). With no analysis of the issue, the Fourth Circuit reached a conclusion opposite of the one this Court

against his former state employer for violation of the FMLA self-care provision. *Toeller*, 296 F.Supp.2d at 947. The district court ruled on the precise issue that faced the *Hibbs* court and that this Court faces today; whether the FMLA is a valid exercise of congressional power that renders states amenable to suit. The *Toeller* court chose to extend *Hibbs'* narrow holding and held that "Congress's enactment of the self-care/medical provision of the FMLA is a proper exercise of its remedial authority under § 5 of the Fourteenth Amendment." *Toeller*, 296 F.Supp.2d at 950. For several reasons discussed below, the Court finds the *Toeller* approach unpersuasive and *Brockman's* result a more accurate interpretation of *Hibbs*.

In any event, the Plaintiff would afford the *Hibbs* holding greater latitude than its authors intended. Though severability of the FMLA has not been expressly addressed, the "Clintonesque parsing" of which the Plaintiff complains has, at least, been impliedly approved by the Supreme Court. There are numerous indications within the *Hibbs* opinion to support the conclusion that the court, too, participated in "Clintonesque parsing" of the FMLA's leave provisions. 538 U.S. at 725, 726, 737, 740 ("We hold that employees of the State of Nevada may recover money damages in the event of the State's failure to comply with the *family-care provision* of the Act;" "We grant certiorari to resolve a split ... whether an individual may sue a State for money damages in federal court for violation of § 2612(a)(1)*(C);* " framing the issue as "whether Congress acted within its constitutional authority when it sought to abrogate the States' immunity for purposes of the FMLA's *family-leave provision;* " "We believe that Congress' chosen reme-

dy, the *family-care leave provision* of the FMLA, is 'congruent and proportional to the targeted violation;' " "we conclude that 2612(a)(1)*(C)* is congruent and proportional to its remedial object.") (emphases added). Also, more recently, the Supreme Court seems to have acknowledge its own severance of the FMLA family-care provision in *Tenn. v. Lane*, —— U.S. ——, 124 S.Ct. 1978, 1981, 1991, 158 L.Ed.2d 820 (2004) (recognizing "the Court approved the *family-care leave provision* of the Family and Medical Leave Act of 1993" and "we approved the *family-care leave provision* of the FMLA.") (emphases added). Furthermore, the Tenth Circuit offers additional support for this bifurcated approach. In *Brockman*, the court expressly noted that *Hibbs* did not overrule courts' prior invalidation of the self-care provision. *Brockman*, 342 F.3d at 1165 n. 3. Frankly, it would be utterly unreasonable to assume that the Supreme Court intended to make a broad sweeping approval of the FMLA's attempted abrogation of states' immunity in light of the precise and specific analysis related wholly to subsection (C) and the court's carefully worded holding. Thus, this Court declines to interpret *Hibbs* any more broadly than the Supreme Court so clearly intended.

### 3. Sovereign Immunity

■ The Eleventh Amendment bars private law suits in federal court against an unconsenting state. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). This reprieve from suit or sovereign immunity is not absolute. Congress may pierce a state's protection from suit through a valid exercise of its power granted under Section 5 of the

---

reaches today. Rather, the Fourth Circuit appears to accept the approach asserted by the Plaintiff herein, that *Hibbs* stands for the proposition that "sovereign immunity does

not protect the states in FMLA actions." *Montgomery*, 2003 WL 21752919 at *1. In the absence of more consideration, this Court is unpersuaded by such a general conclusion.

Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Congress may abrogate states' immunity when it (1) unequivocally expresses its intent to do so and (2) acts pursuant to a valid grant of constitutional authority. *Id.* 528 at 73; *see, also, Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

The first inquiry, whether Congress expressed a clear intent to preempt sovereign immunity with enactment of the FMLA, has previously been answered by the Supreme Court: "the clarity of Congress' intent here is not fairly debatable." *Hibbs*, 538 U.S. at 726, 123 S.Ct. 1972 (referring to the plain text of the FMLA). Therefore, the pivotal issue in this case is whether Congress' inclusion of subsection (D), the self-care provision, was a valid exercise of power under Section 5 of the Fourteenth Amendment.

### 4. Congress' Section 5 Power

Section 5 provides Congress with the "power to enforce, by appropriate legislation," the substantive guarantees of the Fourteenth Amendment. U.S. Const. amend. XIV, § 5. Congress may act pursuant to Section 5 authority in order to remedy or deter violations to rights secured under the Fourteenth Amendment. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). Congress' Section 5 legislation is considered remedial when it acts to redress behavior declared unconstitutional by the Judiciary. *Kimel*, 528 U.S. at 81, 120 S.Ct. 631. Conversely, Congress may enact "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Hibbs*, 538 U.S. at 727–28, 123 S.Ct. 1972.

Though appropriate Section 5 legislation may prohibit "a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text," *Garrett*, 531 U.S. at 365, 121 S.Ct. 955 (internal quotations omitted), prophylactic legislation may not, however, "attempt to substantively redefine the States' legal obligations" under the Fourteenth Amendment. *Kimel*, 528 U.S. at 88, 120 S.Ct. 631. In order to define the boundary between appropriate legislation and that which attempts to substantively redefine the Fourteenth Amendment's guarantees, the Supreme Court applies a "congruence and proportionality" analysis. *City of Boerne v. Flores*, 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

Section 5 legislation is valid when there is a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520, 117 S.Ct. 2157. Hence, the inquiry requires the reviewing court to (1) "identify with some precision the scope of the constitutional right at issue," *Garrett*, 531 U.S. at 365, 121 S.Ct. 955, and (2) to determine whether the statute is an appropriate remedy for violations of the right at issue. *Kimel*, 528 U.S. at 88, 120 S.Ct. 631. To provide guidance on these issues, courts typically look to the purpose and plain language of the statute and the legislative record surrounding its passage. *Hibbs*, 538 U.S. at 728–39, 123 S.Ct. 1972; *Garrett*, 531 U.S. at 367–74, 121 S.Ct. 955; *Kimel*, 528 U.S. at 88–90, 120 S.Ct. 631.

### 5. Right At Issue

The first step in the congruency and proportionality test is to identify the specific substantive right at issue. Once again, this task has previously been passed upon by the Supreme Court. In *Hibbs*, the court summarily stated that the general purpose of the FMLA is to "protect the right to be free from gender-based dis-

crimination in the workplace." 538 U.S. at 728, 123 S.Ct. 1972. The plain language of the statute provides a more specific description of Congressional findings and the ultimate goal of the Act.[3] 29 U.S.C. § 2601.

As discussed above, it is clear that the Supreme Court was careful to limit its *Hibbs* holding to the family-care provision, subsection (C), of the FMLA. It is less clear, however, if the same rationale used to legitimize subsection (C) (*i.e.*, remedying the stereotypical treatment of women as primary care givers; "women are mothers first, and workers second.") can save subsection (D) from the preclusive effect of sovereign immunity. *Hibbs*, 538 U.S. at 729–738, 123 S.Ct. 1972.

As for the self-care provision alone, very little justification is given for its inclusion in the FMLA. In *Kazmier*[4], the court rejected the argument that subsection (D) targets gender discrimination. 225 F.3d at 527. Rather, the Fifth Circuit proceeded upon the theory that the self-care provision was designed to prevent discrimination on the basis of temporary disability which is subject to only "the slightest of scrutiny." *Id.* at 528. The *Brockman* court, on the other hand, acknowledged that subsection (D) was not implicated by the Supreme Court's decision because *Hibbs* rested squarely on a heightened level of scrutiny afforded gender discrimi-

nation. *Brockman*, 342 F.3d at 1164. Perplexingly, while the Tenth Circuit determined that the gender-based aspects of the family-care provision were not controlling, it nevertheless, held "there is no showing ... that establishes any nexus between gender-neutral medical leave for one's own health conditions and the prevention of discrimination on the basis of gender *on the part of states as employers*." *Id.* at 1165 (*quoting, Laro v. N.H.*, 259 F.3d 1, 13–14 (1st Cir.2001)) (emphasis in original).

Notwithstanding the conflicting rationales, there is some evidence in the legislative record supportive of both views. In addition to the predominate goal of providing gender neutral leave for employees, the inclusion of subsection (D) was motivated by other considerations. As the Fifth Circuit surmised, congress was concerned about the economic impact an employee's temporary disability has on their family and the self-care provision is an attempt to temper any resulting hardship. *See*, S.Rep. No. 102–68, at 32 (1991)[5]. Included in this consideration is the protection gender neutral medical leave would afford pregnant women by allowing leave for pregnancy related conditions. *See*, S.Rep. No. 102–68 at 35 (1991)[6].

Gender based classifications are subjected to a heightened degree of scrutiny. To

---

**3.** The Act's more specific purposes include, to balance the demands of the workplace with the needs of the family and preserve family integrity, to entitle employees to take reasonable leave for medical reasons, the birth or adoption of a child, for the care of a child, spouse, or parent who has a serious health condition, to minimize the potential for employment discrimination on the basis of sex by ensuring that leave is available for all medical reasons (including maternity-related disability) on a gender neutral basis. 29 U.S.C. § 2601(b)(1)-(5).

**4.** The Court recognizes that, in the wake of *Hibbs*, the precedential value of the *Kazmier* holding is questionable.

**5.** "The fundamental rationale for such a policy is that it is unfair for an employee to be terminated when he or she is struck with a serious illness and is not capable of working. Medical leave is a necessity for American workers, especially for poor families. The serious threat to the employee's health is difficult enough to deal with alone without adding the prospect of job loss and termination of health insurance at such a time."

**6.** "Another significant benefit of the temporary medical leave provided by this legislation is the form of protection it offers women workers who bear children. Because the bill treats all employees who are temporarily un-

be valid, such a distinction "must serve important governmental objectives and must be substantially related to the achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Whereas, discrimination based on disability is subject only to the slightest scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 435, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). However, *Garrett* has effectively disposed of the disability rationale as a sufficient basis to overcome Eleventh Amendment immunity. *See, Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). In order to be measured by the heightened constitutional ruler, there must be "evidence of a pattern of constitutional violations on the part of the States in this area." *Hibbs*, 538 U.S. at 729, 123 S.Ct. 1972.

### 6. Legislative History

The bulk of the legislative record pertaining to subsection (D), self-care, relates to the financial as well as the emotional impact that a temporary illness can have upon employees and their families. *See*, S.Rep. No. 103–3, at 11–12 (1993), U.S.Code Cong. & Admin.News 1993, at 3; S.Rep. No. 102–68, at 32–33 (1991); H.R.Rep. No. 101–28(I), at 23 (1989) ("The temporary medical leave requirement is intended to provide basic, humane protection to the family unit when it is most in need of help."). None of the evidence presented to Congress, however, could properly be imputed to state sponsored discrimination.[7] And, although admirable in its objectives, there is no indication that employers, private or public, participated in a pattern of discriminatory conduct by granting or denying medical leave based on an employee's gender.

In fact, in an effort to demonstrate the *de minimis* financial obligation that would be imposed on employers to comply with the Act, the record states, "evidence suggests that only a minority of firms actually take the harsh termination approach to [workers suffering from a serious health condition]." H.R.Rep. No. 101–28(I), at 14 (1989). Another interesting admission states, "[recent] studies provided to the Committee indicate that men and women are out on medical leave approximately equally." H.R.Rep. No. 101–28(I), at 15 (1989)[8]. Additionally, the Court was unable to locate any suggestion of a pattern of discrimination based on pregnancy related illness on the part of the private sector, much less the states.

### 7. Congruence and Proportionality

As discussed above, the primary aim of the FMLA is to legislate leave for all

able to work due to serious health conditions in the same fashion, it does not create the risk of discrimination against pregnant women posed by legislation which provides job protection only for pregnancy related disability. Legislation solely protecting pregnant women gives employers an economic incentive to discriminate against women in hiring policies; legislation helping all workers equally does not have this effect."

7. Frances Wright testified of disparate treatment after having developed colon cancer. Ms. Wright was fired from her job of ten years as a manager of a retail store. Barbara Hoffman, of the National Coalition for Cancer Survivorship, testified that cancer survivors are frequently discriminated against solely because of their cancer history. Eleanor Holmes Norton testified of the impact a temporary disability has on single-parent employees. S.Rep. No. 103–3, at 11–12 (1993).

8. "Men workers experience an average of 4.9 days of work loss due to illness or injury per year, while women workers experience 5.1 days per year. The evidence also suggests that the incidence of serious medical conditions that would be covered by medical leave under the bill is virtually the same for men and women."

eligible employees without regard to gender. While the Court applauds Congress' efforts in this regard, it is not convinced that the self-care provision of the FMLA validly abrogates states' sovereign immunity. Also, contrary to the Plaintiff's and the Eastern District of Wisconsin's conclusion, the Court does not believe that the rationale of *Hibbs* requires a different result.

The decision reached in *Hibbs*, regarding family-care leave, was substantiated by decades of discrimination against women, in particular, women who had demanding family obligations. Without rehashing history, suffice it to say that women, historically the primary care-givers, were being denied the same employment opportunities as their male counterparts because they, women, generally required more leave than men to care for their families. This reality lead to the general perception that "women are mothers first, and workers second." *Hibbs*, 538 U.S. at 736, 123 S.Ct. 1972. And, this stereotypical role was "reinforced by the [presumed] lack of domestic responsibilities for men." *Id.* Thus, "[t]hese mutually reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees." *Id.* Considering this evidence, the court determined that the family-leave provision, subsection (C), was a congruent and proportional remedy for years of gender discrimination.

In *Toeller*, the court appears to have adopted much of *Hibbs'* rationale in an attempt to justify the self-care provision. *Toeller*, 296 F.Supp.2d at 948–50. *Toeller* identifies two concerns at which subsection (D) attempts to address; discrimination against mothers or mothers to be and the financial hardship that a serious health condition may cause single parents who in most cases are women. 296 F.Supp.2d at 949. Then the court goes on to declare that somehow the self-care provision will prevent employers from preferring single men without children "because these employees would be unlikely, if not less likely, to seek leave under the child or family leave provisions." *Id.* at 949. The reasoning continues that "Congress has attempted to preclude any incentive for an employer to hire a man over a woman because, regardless of sex or family status, all eligible employees are entitled to leave under the FMLA." *Id.*

In this Court's opinion, *Toeller's* reasoning is incompatible with the result it reached. It is important to remember that the self-care provision provides leave for an employee based on his or her own serious medical condition; not that of a family member or child. So, *Toeller's* first justification is a more accurately applicable to subsection (C), family-care leave, than to subsection (D). It is confounding how an employee's occasion to seek leave to care for family members would have any impact on the inclusion of a self-care provision. As *Hibbs* held, the family-care provision was included to prevent employers from preferring to hire men over women. Self-care leave simply cannot be sustained on these same grounds.

*Toeller's* second justification, though more general, is also equally paradoxical. How does gender neutral medical leave for an employee's own illness combat discrimination based on an employee's probability to use family leave? Though *Toeller* relies on this rationale, it does not provide an answer this question. Does the *Toeller* court assume that a single parents or women are more likely to suffer from a

serious medical condition?[9] In the absence of evidence such a presumption would be inappropriate and incorrect in light of the legislative findings below. Contrary to family-care leave, there is no evidence of a pattern of gender discrimination with regard to personal medical leave benefits provided to employees.

Indeed, it is difficult to conjure any circumstances in which this same justification can be applied to the FMLA's self-care provision. There is no indication that women require more actual personal medical leave than men. Nor is there any evidence that women have suffered disparate treatment due to a false perception that they require more personal medical leave than men. Likewise, there is no proof that single parents are more likely to suffer from a serious medical condition than employee's without children. Certainly, pregnancy might create the need for more incidents of leave among women than men. However, any employment discrimination based upon pregnancy is strictly prohibited by the Pregnancy Discrimination Act. 42 U.S.C. § 2000e(k).

With regard to only subsection (D), there is simply no evidence to this Court's knowledge that women and men have been subjected to different standards for personal medical leave. In fact, as noted earlier, the discussion surrounding the inclusion of subsection (D) acknowledges "that men and women are out on medical leave approximately equally." H.R.Rep. No. 101–28(I), at 15 (1989). Specifically, "[m]en workers experience an average of 4.9 days of work loss due to illness or injury per year, while women workers experience 5.1 days per year." *Id.* Furthermore, "[t]he evidence also suggests that the incidence of serious medical conditions that would be covered by medical leave

under the bill is virtually the same for men and women." *Id.*

Clearly, in light of the legislative record, Congress may have acted gratuitously. That is, the attempt to remedy alleged past harm or deter presumed future harm is not linked to any evidence of gender discrimination. There is no evidence of an identifiable injury to which subsection (D) is the remedy. Without a specific demonstrable harm or the substantial possibility of future abuse, any attempt to determine the congruency and proportionality of this prophylactic legislation would be an exercise in futility. In the absence of corroborating evidence, this court will not presume that states have or will engage in discriminatory practices in granting or denying employees personal medical leave.

Therefore, the Court finds that the self-care provision is not a congruent or proportional remedy for gender discrimination. Congress' action, the inclusion of subsection (D) in the FMLA, is not appropriate Section 5 legislation. For all the foregoing reasons, subsection (D), the self-care provision, of the FMLA did not result in a valid abrogation of states' sovereign immunity.

### D. Conclusion

In sum, the Court finds that there is no evidence of a pattern of gender discrimination in granting personal medical leave to employees by either public or private employers. Subsection (D), the self-care provision, of the FMLA did not effectuate a valid abrogation of the State's immunity. Accordingly, for reasons discussed heretofore, the Defendant's motion to dismiss is granted.

A separate order in accordance with this opinion shall issue this day.

---

**9.** Interestingly, *Toeller* cited but failed to square its conclusion with the Tenth Circuit's contrary holding in *Brockman.* 296 F.Supp.2d at 948.

## ORDER GRANTING MOTION TO DISMISS

Pursuant to an opinion issued this day, it is hereby ORDERED that

(1) the Defendant's motion to dismiss (docket entry 8) is GRANTED;

(2) the Plaintiff's claims are DIS-MISSED; and

(3) this case is CLOSED.

All memoranda, depositions, declarations, and other materials considered by the Court in ruling on this motion are hereby incorporated into and made a part of the record in this action.