Joanne BYLSMA, Plaintiff,

v.

Nick D. BAILEY, in his official capacity Acting Director of the Alabama Department of Economic and Community Affairs (ADECA), and Steve Walkley, in his official capacity as Division Director of the ADECA Workforce Development Division, and individually, Defendants.

No. CIV.A. 00–A–609–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 22, 2001.

Alvin T. Prestwood, Jamie A. Durham, Volz, Prestwood, Hanan & Barganier, PC, Montgomery, AL, for Plaintiffs.

Edward E. Davis, Alabama Department of Economic and Community Affairs, Margaret L. Fleming, Charles B. Campbell, Office of the Attorney General, Alabama

State House, Redding Pitt, U.S. Attorney, U.S. Attorney's Office, Montgomery, AL, David W. Ogden, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, Richard G. Lepley, Susan M. Demske, U.S.Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief District Judge.

## I. INTRODUCTION

This case is before the court on a Motion to Reconsider filed by the Defendants on September 29, 2000, and on a Second Renewed Motion to Dismiss/Motion for Summary Judgment filed by the Defendants on November 27, 2000.

The Plaintiff, Joanne Bylsma, filed her Complaint in this case on May 11, 2000. The Defendants subsequently filed a Motion to Dismiss or for Summary Judgment which was granted in part and denied in part by this court on September 15, 2000. In ruling on the motion, the court noted that the Defendants had not raised the issue of Eleventh Amendment immunity.

On September 29, 2000, the Defendants asked the court to reconsider the denial of its original Motion to Dismiss, or in the Alternative for Summary Judgment, treated as a Motion for Summary Judgment, as to the Family Medical Leave Act ("FMLA") claim, arguing that the state is immune under the Eleventh Amendment and that Congress' purported abrogation of such immunity is unconstitutional. The Defendants also indicated that they would be filing a new Motion for Summary Judgment on the merits of the Plaintiff's claims.

This court subsequently entered an Order stating that it would decide the Defen-

dants' motion raising the Eleventh Amendment immunity defense along with the Second Motion for Summary Judgment. The court also notified the Attorney General of the United States of America that the constitutionality of a federal statute was being called into question.

On November 16, 2000, the United States Department of Justice filed a Motion to Intervene, which was granted by this court.

In deciding the Defendants' Motions, the court has considered all of the briefs and submissions of the Defendants, the Plaintiff, and the United States.

## II. SUMMARY JUDGMENT STANDARD [1]

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some

---

1. Although the parties have applied the standards both for summary judgment and for dismissal in their briefs, since the motion was styled an alternative motion for summary judgment, the court referred to the motion as a Motion for Summary Judgment in its order

setting the briefing schedule, the parties have relied on evidence outside of the pleadings, and since both sides have argued the summary judgment issues, the court will treat the motions as summary judgment motions.

element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *FACTS*

The submissions of the parties establish the following facts, viewed in a light most favorable to the non-movant:

The Plaintiff is an employee of the Alabama Department of Economic and Community Affairs ("ADECA"). The Plaintiff contends that she has been retaliated against by Defendant Steve Walkley ("Walkley"), who at one time served as her supervisor, and Ben Barnes ("Barnes"), her current supervisor, in violation of the First Amendment because she reported an over-obligation of public funds and violations of federal law, and in violation of the FMLA because she requested FMLA leave. The Plaintiff says that her performance evaluation was lowered, she was denied advance sick leave, and her supervisory duties were taken away from her, among other employment actions.

The Defendants dispute that the Plaintiff suffered an adverse employment action of any kind. The Defendants further contend that the report written by the Plaintiff which purported to report an over-obligation of funds and violations of federal law was in error, and that the Defendants acted legally in denying the Plaintiff advance sick leave.

## IV. *DISCUSSION*

### A. *First Amendment Claim*

The Defendants have presented extensive arguments as to why they are due to prevail on the merits of their Motion for Summary Judgment as to the Plaintiff's First Amendment claim. In ruling on a Motion for Summary Judgment previously filed by the Defendants, the court concluded that Defendant Walkley was due to be granted qualified immunity on the First Amendment claim, but that the claim would proceed against Defendant Walkley in his official capacity and against Nick Bailey ("Bailey"), who was only sued in his official capacity as Director of ADECA.

■ In their Second Renewed Motion for Summary Judgment, and in an intervening Motion for Reconsideration, the Defendants have raised the defense of Eleventh Amendment immunity. The Defendants point out that a suit against Walkley and Bailey in their official capacities is essentially a suit against the State of Alabama. The Plaintiff has not responded to this argument.

A state is not considered to be a "person" for purposes of § 1983 actions. *Will v. Michigan Department of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). In addition, where a party attempts to sue a state or a state agency in federal court, the Eleventh Amendment prohibits the federal court from exercising jurisdiction over the suit, except where the state has consented to be sued or waived its immunity, or where

Congress has overridden the state's immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Quern v. Jordan,* 440 U.S. 332, 341, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Furthermore, "[l]awsuits against a state official in his or her official capacity are suits against the state when 'the state is the real, substantial party in interest.'" *Carr v. City of Florence, Ala.,* 916 F.2d 1521, 1524 (11th Cir.1990)(quoting *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Where a plaintiff seeks monetary relief from a state employee in his or her official capacity, the state is considered the real party in interest because an award of damages would be paid by the state. *Id.* Consequently, summary judgment is due to be GRANTED on the First Amendment claims to the extent that the Plaintiff seeks monetary damages.

■ State agents in their official capacities, however, may be properly subject to prospective injunctive relief under § 1983 because such actions are not treated as actions against the State. *See Cross v. State of Ala. Dept. of Mental Health & Mental Retardation,* 49 F.3d 1490 (11th Cir.1995); *see also Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Furthermore, the Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief. *See Cross,* 49 F.3d at 1503; *Wu v. Thomas,* 863 F.2d 1543, 1550 (11th Cir.1989). In this case, the Plaintiff has requested prospective injunctive relief. Accordingly, the court will examine the merits of the grounds for summary judgment as to her First Amendment claims to determine whether she may proceed on her claims against the individual defendants in their official capacities for prospective injunctive relief.

■ A claim by a public employee that he or she was punished for exercising a right to freedom of speech requires the court to conduct a four part inquiry. First, the court must determine whether the alleged speech implicated a matter of public concern. *Watkins v. Bowden,* 105 F.3d 1344 (11th Cir.1997) (citation omitted). If so, the court must weigh the employee's First Amendment interest against the interest of the public employer. *Id.* at 1352; *see also Pickering v. Bd. of Ed.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)(the court must balance "an employee's interest as a citizen in commenting on matters of public concern ... against the state's interest as an employer 'in promoting the efficiency of the public services it performs through its employees.'"); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). These first two elements are referred to as the *Pickering–Connick* balancing test. If the employee prevails on the *Pickering–Connick* balancing test, the fact-finder determines whether the employee's speech was a substantial motivating factor in the employment decision. *Watkins,* 105 F.3d at 1352. Then, the government must prove by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct. *Id.*

In determining whether the Plaintiff's speech was on a matter of public concern, the court must look to the content, form, and context of the employee's speech. *See Bryson v. City of Waycross,* 888 F.2d 1562 (11th Cir.1989). Courts "consider whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee." *Morgan v. Ford,* 6 F.3d 750 (11th Cir.1993), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994). To rise to a level of public concern, statements must be directed "beyond the scope of internal management." *Kurtz v. Vickrey,* 855 F.2d 723 (11th Cir. 1988).

■ In ruling on an earlier motion filed in this case, the court determined that a question of fact had been raised which was

sufficient to preclude summary judgment on the First Amendment claim, as to the Defendants in their official capacities, at that stage in the case. The Defendants have now pointed to additional evidence, primarily from the Plaintiff's deposition, which was taken after this court's opinion was issued, in an attempt to establish that there is no question of material fact and that they are entitled to summary judgment on this claim.

The First Amendment claims stem from the Plaintiff's contentions that she suffered adverse employment actions because of a report that she wrote as a part of her job duties as a monitor for a state program. The Plaintiff asserts that she reported over-obligations of funds and violations of federal law and was told to remove these portions of her report. This court pointed out in ruling on the earlier motion filed in this case that the Eleventh Circuit has held that a report generated in the normal course of an employee's duties as an accident investigator was not speech that was a matter of public concern. *See Morris v. Crow*, 142 F.3d 1379 (11th Cir.1998). In so holding, the Eleventh Circuit distinguished a Fifth Circuit decision in which a county auditor's report of violations of the law was determined to be a matter of public concern. *See Warnock v. Pecos County, Texas*, 116 F.3d 776 (5th Cir.1997). The Eleventh Circuit distinguished the case on the basis that the plaintiff in the Fifth Circuit case was attempting to improve the quality of government, while there was nothing to indicate that the plaintiff in the Eleventh Circuit case was doing anything more than accurately reporting an accident. *Morris*, 142 F.3d at 1382. The Eleventh Circuit emphasized throughout its discussion that the plaintiff in that case was merely reporting on a single accident in the course of his job. *Id.* at 1381–82.

The parties have not addressed this aspect of the question of whether the Plaintiff's speech is a matter of public concern. Since the time of this court's ruling on the earlier-filed motion, however, the Eleventh Circuit has elaborated on its holding in *Morris*. *See Oladeinde v. Birmingham*, 230 F.3d 1275 (11th Cir.2000)(concluding that the plaintiff's speech was on a matter of public concern, but ultimately holding that individual officers were entitled to qualified immunity). In *Oladeinde*, two police officers complained that they were retaliated against after they approached their supervisor and asked for permission to speak to the district attorney about other officers looking at the records involved in the investigation of the police chief's alleged tampering with prison records. *Id.* at 1292. The court distinguished these facts from the facts in *Morris* because there was no evidence in the record in *Morris* that the plaintiff's purpose was to bring to light any wrongdoing or to do any more than accurately report an accident in the course of employment. *Id.* The plaintiffs in *Oladeinde*, although reporting only to a supervisor, made their report with the purpose of bringing possible wrongdoing to light. *Id.* The standard which appears to have been established by the Eleventh Circuit in *Oladeinde* by distinguishing *Morris*, therefore, is that the speech of the public employee must have been for the purpose of bringing possible wrongdoing to light. This standard is consistent with the standard that has been applied by this court in this case based on *Morris*. *See* Memorandum Opinion and Order, Sept. 15, 2000, at page 7. The court will, therefore, evaluate the facts in this case to determine whether the Plaintiff's speech was made to bring possible wrongdoing to light.

The Plaintiff in this case has contended that she was retaliated against for not removing from her report references to over-obligation of funds, for reporting a lack of procurement authorization, and for reporting a lack of annual procurement reviews being conducted.

The Defendants state that the Plaintiff's report as to all three of these matters was incorrect and, therefore, cannot support her First Amendment claim. Of course,

under *Oladeinde*, there must only be possible, not actual wrongdoing. Furthermore, in the Eleventh Circuit, false speech can still be protected, but recklessly or knowingly false speech on a matter of public concern means that the *Pickering–Connick* balance will favor the government. *See Stanley v. City of Dalton, Georgia*, 219 F.3d 1280 (11th Cir.2000).

According to the Plaintiff, she consistently stated in a report that there was an over-obligation of public funds, even though told not to do so. Also according to the Plaintiff, the item which was eventually removed from the final version of the report, regarding over-obligation of funds, was removed because corrections were made during the time that the report was being drafted. Because the Plaintiff continued to report what she thought was wrongdoing even though told by her supervisor not to do so, this court concludes that there is sufficient evidence that the Plaintiff's reporting of over-obligated funds was done in an effort to bring possible wrongdoing to light under *Oladeinde* and not just to perform her job tasks, which satisfies the first prong of the *Pickering–Connick* test.

■ The improper expenditure of funds raises a slightly different issue. Although characterized by the Plaintiff as a finding that funds were improperly expended, the Defendants point to the Plaintiff's statements in her deposition that what she actually found was that she could not locate the Governor's appointment letters which would verify that some of the Private Industry Council's Board ("Board") members had been appointed to serve in the Board positions by the Governor. *See* Plaintiff's Deposition, page 97. The Plaintiff's response to this evidence is that the absence of the letters means that there could be questions as to whether the Board was legally appointed which could in turn open the Board up to questions regarding costs. The Plaintiff also states that the Defendants have not produced these letters.

The facts in this case must fit into an exception recognized by the Eleventh Circuit in order to be considered protected speech. That is, the Eleventh Circuit has held that an employee's performance of his job duties is not speech on a matter of public concern unless, as in *Oladeinde*, the purpose of the speech is to bring to light wrongdoing. The evidence cited by the Plaintiff establishes that the absence of letters made it difficult to demonstrate that the Board was legally appointed. The Plaintiff agreed in her deposition with the characterization of this problem as a "documentation problem." Plaintiff's Deposition, page 122, 10–11. There is no contention that funds were improperly expended. After careful consideration of the evidence, this court concludes that a statement in a report, by the person whose job is it to review a state program, that the program does not contain all of the required documentation is not a statement identifying possible wrongdoing which would remove it from the *Morris* holding.

■ The next aspect of the Plaintiff's speech which is at issue is her statement that a procurement review had not been conducted by the Alabama Service Delivery Area. The Plaintiff has stated that the procurement review would have revealed the over-obligation of funds. The Plaintiff also states that the failure to conduct such a review was a violation of federal law by the Alabama Service Delivery Area. The court concludes that the statement regarding procurement reviews, which are allegedly tied to the over-obligation of funds, is sufficient to fall within the *Oladeinde* exception to *Morris*.

■ Having found that some of the Plaintiffs' speech was on a matter of public concern, the court will turn to the second part of the *Pickering/Connick* balancing test and apply it to the over-obligation of funds and the lack of procurement review. As earlier stated, under the second prong, the state's interest will outweigh the Plaintiff's if she knew or recklessly should have known that her speech was false.

In deciding an earlier motion filed in this case, the court found insufficient evidence in the Plaintiff's affidavit from which to conclude that she was conceding that her earlier statements that there over-obligations of funds were inaccurate. *See* Memorandum Opinion and Order at page 9. The Plaintiff's deposition has been taken since that time. The Defendants have cited this court to portions of the Plaintiff's deposition wherein she states that after she spoke with Billy Hornsby and traced the funds, she concluded that there were no over-obligations. Plaintiff's Deposition at page 112. In her response to the Defendants' arguments, the Plaintiff explains that this deposition testimony means that she agrees that there were no obligations at the time of her final draft and points out that she states in this same portion of her deposition cited by the Defendants that there were over-obligations and these over-obligations were corrected by adjustments while she was drafting her report. The Plaintiff argues that if she had not reported the over-obligations in her draft reports, the corrections might not have been made, leading to an over-expenditure of funds.

In their Reply Brief, the Defendants state that Walkley told the Plaintiff that she would find an over-obligation of funds when he assigned the monitoring report to her and the Plaintiff's perception that the over-obligations were a problem was due to her own lack of understanding of the way in which programs were managed at ADECA. The Defendants have not, however, cited any evidence in support of the statements made in their brief. The Plaintiff has denied that Walkley told her in the early stages of her review that there would be over-obligations. Plaintiff's Deposition, page 136, lines 5–12. In addition, while there has been evidence cited to this court earlier in the record to show that over-obligations were common, the Plaintiff has also cited to Walkley's deposition in which he stated "It's not the fact that it was an over-obligation. It was a significant over-obligation." Walkely Deposition page 39, lines 19–20.

The Defendants further assert that although the Plaintiff states that she was unaware of certain reports, she should have been and that "whether she admits the facts or not, she had been informed of the adjustments." Defendant's Response to Plaintiff's Response, page 12.

There is obviously a great deal of disagreement between the parties as to whether the over-obligation of funds in the program was a problem, or was routine, and as to the Plaintiff's knowledge regarding this situation. This court's function at the summary judgment stage is to determine if there is a dispute of facts which would preclude the Defendants from being entitled to judgment as a matter of law. The Plaintiff's deposition testimony that the corrections to the over-obligation occurred while she was editing her report is at least sufficient to undermine an argument that she made the statements in her draft reports regarding over-obligations recklessly or with knowledge of their falsity. The Plaintiff contends that it was her reporting of such over-obligations which caused the over-obligations to be corrected. While the court recognizes that the Defendants do not accept this explanation, the Defendants have attempted to demonstrate that they are entitled to summary judgment based on the alleged admissions of fact made by the Plaintiff in her deposition. The Plaintiff, however, contests that her deposition testimony should be read as an admission. She maintains that she simply agreed that the over-obligations were corrected, but she does not concede that the over-obligation was never a problem. Plaintiff's Brief, page 3. The court cannot conclude, therefore, that this prong of the *Pickering–Connick* balancing test should weigh in favor of the Defendants, because there is insufficient evidence from which to conclude that the Plaintiff knowingly or recklessly reported false information.

As to the aspect of the Plaintiff's speech which concerned procurement re-

views, the Defendants state that the Plaintiff admits in her deposition that an ASDA procurement review was conducted in 1997, but the Plaintiff had asserted that no review had been done for the previous two years. Plaintiff's Deposition, pages 253–54. The Defendants argue, therefore, that any statements that federal law had not been complied with which remained in the Plaintiff's final report were made in error, and with knowledge of their falsity, so that the Plaintiff cannot prevail on the *Pickering–Connick* balancing test. The Defendants also argue that at the time that the final report was issued, the over-obligations had been corrected, and so it was no longer correct to say that the procurement reviews would have identified this problem.

The Plaintiff disputes the accuracy of the evidence that a procurement review was conducted in 1997, pointing to the statement in her report that the 1998 program was on a two year procurement cycle. The Plaintiff also states that she had not seen the document which states that there was a procurement review in September 1997 until her deposition was taken in this case. In their Reply, the Defendants state that the Plaintiff should have been aware of these documents. Drawing all inferences in favor of the non-movant, however, this court concludes that at least a question of fact has been raised as to whether the review was made in 1997, but more significantly, as to whether the Plaintiff was aware of the report, which precludes this court from concluding at this stage in the proceedings that the Plaintiff had, or recklessly lacked, knowledge, that her statements as to the lack of procurement reviews were false. As to the argument that the over-obligations had already been corrected, under the Plaintiffs' theory, it was her report which brought the higher than usual over-obligation to light so that it could be corrected. Accordingly, merely because the corrections were ultimately made does not mean that they could not have been identified earlier through a procurement review. The court

realizes that the Defendants sharply contest the Plaintiffs' theory, but, at this stage in the proceedings, it is this court's obligation to view the facts in a light most favorable to the non-movant and to draw all inferences in favor of the non-movant.

█ Moving to the third part of the First Amendment analysis, the Defendants also dispute that any speech by the Plaintiff was a motivating factor in any employment actions she has identified as being retaliatory. There are several alleged adverse employment actions discussed in the briefs, some of which have occurred subsequent to the opinion entered by this court on an earlier motion filed by the Defendants. The court first will determine which of these actions can constitute an adverse employment action, and then will turn to the question of whether there is evidence that any protected speech by the Plaintiff was a substantial motivating factor in the employment action.

One adverse employment action pointed to by the Plaintiff is the removal from her of duties as assistant section supervisor. The Defendants have contended that it was in violation of state law for the Plaintiff to be an assistant section supervisor, and so no assistant supervisor duties were taken away from her. The Defendants also state that the Plaintiff's duties as assistant section supervisor were taken away by Rodney Stephen Davis, her former supervisor, in 1994, not by Walkley in 1999.

The Plaintiff points out that a "Form 40" signed by Rodney Stephen Davis lists her as an assistant section supervisor, and that when she received her raise in 1998, the reasons for the raise recommendation stated that the Plaintiff had functioned as the assistant supervisor for the past three years. *See* Plaintiff's Exhibit 5. This document also states, "Previously this position had been filled by a PED III." *Id.* This documentary evidence indicates that, contrary to the Defendants' argument, the Plaintiff was performing supervisory functions beyond 1994.

The Defendants have responded to the Plaintiff's evidence arguing that the Plaintiff's former supervisor did not have the authority to designate the Plaintiff as an assistant section supervisor and that, at most, she acted as assistant section supervisor "in action only" and without any authority. Defendants' Response, pages 14–15.

The court has reviewed the evidence which it has been provided relevant to this issue. Defendants' Exhibit 14–A is the Form 40 wherein Rodney Stephen Davis designated the Plaintiff as an Assistant Section Supervisor. Defendants' Exhibit 14–B is a memorandum from Vivian B. Ingram to Rodney Stephen Davis wherein she states that the State Personnel Department and the agency strongly urge against having an employee in one class supervise other employees in the same class. The memo also states that the Plaintiff can coordinate work, but cannot complete evaluations, nor be shown as the supervisor. *Id.* Defendants' Exhibit 14–C is a Form 40 wherein the Plaintiff is no longer designated as the Assistant Section Supervisor. As earlier stated, however, in 1998, a form indicates that the Plaintiff performed supervisory functions.

The evidence produced to the court, therefore, undermines the bases for summary judgment articulated by the Defendants that the supervisory responsibilities were taken away in 1994, but the evidence does not address the more difficult question of whether an employee who has had duties taken away from her which she was performing even though they were functions of a position the employee was not authorized to hold, has suffered an adverse employment action.

" 'Adverse employment action' is broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands." *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir.1994). In the Eleventh Circuit, to constitute an adverse employment action under the discrimination statutes, an action must meet a threshold level of substantiality. *See Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453 (11th Cir.1998). This analysis can be analogously applied to the First Amendment claim. *See Merriweather v. Alabama Dept. of Public Safety,* 17 F.Supp.2d 1260 (M.D.Ala.1998), *aff'd,* 199 F.3d 443 (11th Cir.1999). The Eleventh Circuit has also concluded, in the context of an Americans with Disabilities Act claim, that an adverse employment action must be considered to be adverse under an objective standard, and that not every unkind act or every act that the employee disagrees with can be considered to be an adverse employment action. *See Doe v. Dekalb County School Dist.,* 145 F.3d 1441 (11th Cir.1998).

In this case, the facts are not limited to the allegation that duties which the Plaintiff was not authorized to perform were taken away from her. While it appears clear that she was no longer classified as an assistant supervisor after 1994, Plaintiff's Exhibit 5 appears to state that the pay raise in 1998 is based in part on the fact that the Plaintiff was performing assistant supervisory duties. There is, however, a section of the Plaintiff's deposition wherein she is asked if, when conducting his review of her, Barnes accounted for the fact that the Plaintiff was no longer performing some of the duties she had been performing. *See* Plaintiff's Deposition, page 306. The Plaintiff admitted that, at least as regards an evaluation item of supervisory responsibilities in the supervisor's absence, the evaluation was marked "not observed." Plaintiff's Deposition, page 306. When asked if Barnes was taking into account that her duties did not comport with the responsibilities and results statement in 1999, the Plaintiff agreed that he was, with regard to this supervision responsibility. *Id.* at lines 16–22. She also stated that there were other items listed as "not observed." *Id.* at lines 1–3. The Plaintiff does not identify any aspect of this review which included a review of any supervisory functions. This

court must conclude, therefore, that there is insufficient evidence to establish that the taking away of job responsibilities of a position which she was not authorized to hold adversely affected the Plaintiff's employment. *Cf. Smith v. Upson County, Ga.,* 859 F.Supp. 1504, 1510 (M.D.Ga.1994) (finding no adverse employment action because the plaintiff suffered no loss in pay, benefits, or classification), *aff'd,* 56 F.3d 1392 (11th Cir.1995). Accordingly, the court finds that, under an objective standard, the Plaintiff did not suffer an adverse employment action in the form of having supervisory functions removed.

■ The Plaintiff further alleges that she suffered an adverse employment action of a lowered employment evaluation when she received a 17.5 out of 40 after having received a 38 out of 40 on her previous evaluation by a different supervisor. The Defendants contest that receiving a "17.5—Meets Standards" score can constitute an adverse employment action. The Defendants further contend that the Plaintiff has not proven retaliation in this performance appraisal.

The Plaintiff responds that because of the lowered score, from a 38 to a 17.5, she was given a one step raise instead of a two step raise. The Defendants do not contest this statement. *See* Defendants' Brief in Support of Summary Judgment, page 19 (stating, without dispute, that "her November 1, 1999 Employee Annual Performance Evaluation rating score was 'lowered' to a score of '17.5—Meets Standards' which resulted in her receiving only a one-step pay raise instead of a two-step pay raise."). This court has concluded in another decision that a performance evaluation which fell into a "meets expectations" was not an adverse employment action where there was no showing that the score was used in any detrimental action against the employee. *See Merriweather,* 17 F.Supp.2d at 1274. In this case, however, there is evidence that the lowered evaluation caused the Plaintiff to receive a smaller raise than she would have received had her evalua-

tion been at its previous level. The court concludes, therefore, that there is sufficient evidence that the lower evaluation was an adverse employment action.

■ As to whether the Plaintiffs' speech was a substantial motivating factor in the adverse action, in this court's previous order addressing the first motion filed by the Defendants, the court found that there were too many questions of fact to conclude that Walkley was not involved in the performance appraisal of the Plaintiff wherein she received a 17.5 on her appraisal rating. In her affidavit, the Plaintiff states that Barnes told her that the performance appraisal she received was a joint rating with Steve Walkley. Affidavit at ¶ 11. In her deposition, when asked if Walkley prepared the report, the Plaintiff answered no. Plaintiff's Deposition, page 310. *Id.* The Defendants, however, do not dispute that Walkley did more than simply rubber stamp the review. In their brief, the Defendants state "Mr. Barnes and Defendant Walkely discussed the performance evaluation ... Defendant Walkley subsequently agreed with the score of '17.5 Meets Standards.'" Defendants' Response at page 23. Given this acknowledgment that Walkley was involved in the review, the court cannot attribute the performance review only to Barnes. Accordingly, evidence of Walkley's intent is relevant in determining whether there is evidence that the Plaintiff's speech was a substantial motivating factor in adverse employment actions.

The Plaintiff states in her affidavit that from November 1998 until May 1999, her supervisor, Walkley, directed her to remove the over-obligated funds and procurement findings from her report. *See* Bylsma Affidavit at ¶ 4. She states that when she submitted her draft to Walkley in a May conference, he directed her to take all references to him, the statements reporting the lack of annual review, and the over-obligation of funds out of the draft, and that when she refused he threw the draft across the table at her and said,

"what are you getting at?" *Id.* She further states that in August she met with Walkley to discuss the report which still had not been finalized and Walkley pulled open her jacket pocket and asked her if she had a tape recorder and told her that he knew she was thinking of filing a lawsuit. *Id.* at ¶ 7. She states that Walkley also said, "You know what happens to people who oppose me, don't you?" three different times. When Bylsma finally responded to the questions by saying, "You make their lives miserable and you ruin their careers," he pointed his finger at her and said, "That's exactly right." *Id.* The Defendants have stated that the Plaintiff has "inaccurately portrayed" this meeting, but in ruling on a Motion for Summary Judgment, this court must accept the Plaintiff's evidence. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

The court concludes that this evidence that Walkley was displeased with the speech at issue in this case, that he told her to take the information out of her report, and agreed with her that he would take actions to ruin a person's career who opposed him is sufficient evidence to create a question of fact as to whether the speech was a substantial motivating factor in the adverse employment action of the lowered performance evaluation.

■■■ The Plaintiff has also pointed to additional alleged adverse employment actions. The Plaintiff asserts that she received a November 1, 2000 performance rating of 20 which was also retaliation by Barnes. The Plaintiff does not explain how she intends to establish liability under § 1983 based on Barnes' actions. Barnes is not a defendant in this case. The court will not, at this late date, allow the Plaintiff to amend her complaint to add a new a defendant. Even if Barnes were a defendant, there is no evidence that he was at all involved in any discussions with the Plaintiff with regard to her protected speech. Furthermore, the Plaintiff has no evidence by which to hold Bailey, in his official capacity as the head of agency, liable for injunctive relief based on Barnes' actions. *See Ex Parte Young,* 209 U.S. 123, 158–59, 28 S.Ct. 441, 52 L.Ed. 714 (1908)(federal courts have jurisdiction where a plaintiff seeks to compel a state officer to comply with federal law); *see also Reeves v. Thigpen,* 879 F.Supp. 1153, 1178 (M.D.Ala.1995)(respondeat superior is an insufficient basis to hold a state agency liable for prospective injunctive relief). The evidence offered by the Plaintiff to establish liability on the part of the director of ADECA is evidence that Dwayne Freeman, the former director, did not respond to Plaintiff's complaints about Walkley.[2] There is no evidence of any actions on the part of any director with respect to Barnes.[3] Summary judgment is, therefore, due to be GRANTED as to this aspect of the Plaintiff's § 1983 claim.

The same reasoning undermines any § 1983 First Amendment claim for injunctive relief against the Defendants in their official capacities for Barnes' alleged denial of the Plaintiff's attendance at supervisory staff meetings, his denial to her of leave to

---

2. The Defendants have asserted no grounds for summary judgment, aside from the merits of the Plaintiffs' claims, as to Bailey for Walkley's actions. The court concludes that summary judgment is, therefore, due to be DENIED as to Bailey. Furthermore, the Plaintiff has stated in her Complaint that the director's presence in this case is necessary for complete relief.

3. Although the Plaintiff does not make this clear, it may be that the Plaintiff intends to hold Walkely liable for Barnes' actions. The Plaintiff cannot hold Walkley liable for Barnes' actions merely because he is his su-

pervisor; however, and the Plaintiff's evidence, including her statement that Walkley used Barnes to humiliate her and her statement in her affidavit that Barnes protected Walkley from her, is not sufficient to establish supervisor liability based on Barnes' actions. *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990)("Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation.").

attend the depositions taken in this case, Barnes' request for additional information in the Plaintiff's Summer 2000 report, Barnes' alleged disparate treatment of the Plaintiff and another employee with regard to providing work-related information, Barnes' denial of advance sick leave, Barnes' October 2000 warning of the Plaintiff, Barnes' placing the Plaintiff on an action plan, and any other actions allegedly taken by Barnes.

■ The Plaintiff has also contended that Walkley harassed and belittled her. Apparently she seeks to bring a harassment claim under a retaliation theory. She has stated in her deposition testimony that Walkley used Barnes to harass and belittle her. Plaintiff's Deposition, page 327. The Plaintiff also states in her brief, citing to her deposition, that she had a meeting with Walkley during which he pointed his finger at her, warned her not to file any lawsuits against him, and stated he would ruin her career. While this evidence may have some probative value as to another claim brought in this case, this evidence of some comments made on one occasion and the Plaintiff's statement that Walkley used Barnes to harass her are not substantial enough to constitute an adverse employment action. *See Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir.1998); *see also Perryman v. West*, 949 F.Supp. 815 (M.D.Ala.1996)(deciding in the context of a retaliation claim brought under discrimination statutes that harassment must be sufficiently severe and pervasive to alter a term or condition of employment to be an adverse employment action).

The Plaintiff also states that the reorganization of the ADECA Workforce Development Division on October 4, 1999 which moved Barnes into the section supervisor position adversely affected her because Walkley has used Barnes to effect his retaliatory and harassing acts. The evidence pointed to by the Plaintiff is her own deposition testimony wherein she states that she thinks Walkley uses Barnes to harass

and belittle her. Plaintiff's Deposition, page 327. The court cannot find that this evidence is sufficient to establish that her speech was a substantial motivating factor in the reorganization when the Plaintiff has not disputed the contention that the reorganization affected 60 employees at ADECA.

The Plaintiff also brings a claim for retaliation for exercising her First Amendment rights which involves her request to receive advance sick leave. The recommendation for denial of her request was made by Barnes. The court finds no evidence to indicate that Barnes was involved in the discussions of over-obligations and other procurement problems in the draft reports. As to Walkley, although he signed off on the recommendation that advance sick leave be denied, because there is no evidence to contradict that the decision was made by Barnes, the court must conclude that there is insufficient evidence that the Plaintiff's speech played a substantial part in the employment decision. Furthermore, there is no evidence that Walkley's agreement with Barnes' recommendation was based on the Plaintiff's draft reports. That is, while the court can conclude that a reasonable finder of fact could conclude that Walkley's alleged threats to ruin the Plaintiff's career can be linked to her reports, the court finds no similar evidence to link the Plaintiff's request to change unpaid leave to paid leave to her report. This court cannot conclude, therefore, that there is sufficient evidence that the draft reports were a substantial motivating factor in any decision to deny the Plaintiff advance sick leave.

■ The remaining step of First Amendment analysis is to determine whether the adverse actions taken would have occurred in the absence of the protected speech. The adverse employment action which the court has found to be supported by sufficient evidence is the Plaintiff's lowered employment evaluation, given her by Walkley and Barnes. The court must conclude that the evidence of

Walkley's alleged conversation with the Plaintiff wherein he threatened her and told her to take out the sections of her report which are at issue here lead this court to conclude that a question of fact has been raised as to whether the lowered employment evaluation would have occurred in the absence of her speech.

Accordingly, summary judgment is due to be DENIED as to the First Amendment claim that the Plaintiffs' performance evaluation was given in retaliation for the Plaintiff's reporting of over obligated funds and violation of federal regulation concerning procurement reviews. Summary judgment is due to be GRANTED as to claims based on all other alleged adverse employment actions allegedly taken in retaliation for protected speech.

## B. *FMLA CLAIM*

The Defendants have argued the merits of some aspects of the Plaintiff's FMLA claims, as well as asserting that the State is entitled to Eleventh Amendment immunity on this claim. The basis for the Defendants' assertion of Eleventh Amendment immunity is the argument that Congress acted outside of its authority in abrogating the State's Eleventh Amendment immunity under the FMLA.

■ When evaluating a claim of retaliation under the FMLA, in the absence of direct evidence of discrimination on the part of the employer, the court applies the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for evaluating Title VII retaliatory discharge claims. *See Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791 (11th Cir.2000). In order to establish a prima facie case of retaliation using the *McDonnell Douglas* framework, a plaintiff must show that (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment decision; and (3) there is a causal connection between the protected conduct and the adverse employ-

ment action. *See Parris v. Miami Herald Publishing Co.*, 216 F.3d 1298, 1301 (11th Cir.2000).

■ There are several different alleged adverse employment actions which the Plaintiff apparently contends were taken in retaliation for her use of FMLA. The first of these is her contention that she was denied the ability to take advance sick leave because she had taken FMLA leave. Barnes, the Plaintiffs' supervisor, recommended that the Plaintiff's request for advance sick leave be denied. This request was then forwarded to Walkley and to former ADECA Director Dwayne Freeman.

The Rules of the State Personnel Board of the State of Alabama provide, in relevant part, as follows:

> Sick leave without pay is not a right for which employees may make a demand, but a privilege ... to which the Board may make exceptions as the best interest of the service demand.

> * * * * * *

> In case of serious disability or illness, sick leave may be advanced to any permanent employee under the following conditions: (1) All accrued leave (sick and annual) must be exhausted before a request for an advance is made. (2) No advance shall be made to any employee unless the absence from duty because of disability is for a period of five days or more. (3) Each application for an advance must be supported by a certificate from a registered practicing physician. (4) The total of advances of sick leave shall not at any time exceed 24 work days. Defendants' Exhibit 13–D.

The Defendants state that they did not approve the Plaintiff for the advance sick leave and that they were not required to give her paid leave under the FMLA. The Defendants cite to the language of the FMLA and the implementing regulations, for the proposition that the FMLA only guarantees unpaid leave, and that any paid

leave which is taken in lieu of FMLA unpaid leave is earned or accrued vacation, personal, or family leave. The Defendants argue that the FMLA does not entitle any employee to substitute unearned and unaccrued paid sick leave for unpaid FMLA leave. Therefore, according to the Defendants, they acted lawfully when they denied the Plaintiff the right to substitute advance sick leave for FMLA to care for her father. The Defendants contend that to treat ADECA's exercise of its rights under the statute as retaliation would disturb the balance Congress struck between the interests of employees and employers.

The court does not disagree with the Defendants that their actions did not violate the provisions of FMLA which require 12 weeks of unpaid leave. That is not, however, the provision of FMLA under which the Plaintiff seeks to bring a claim. The Plaintiff has asserted that her employer retaliated against her and denied her the opportunity to make use of the state policy allowing for the use of advance sick leave because she had taken FMLA leave in the past.[4] If the employer's motivation in denying her a benefit which was available upon approval was to retaliate against her for earlier invoking her rights under the FMLA, then it is irrelevant whether the employer's actions failed to violate another FMLA provision.

As stated above, the Plaintiff's burden in establishing a claim is to show that she engaged in protected activity, she suffered an adverse action, and that there is a causal connection. It is undisputed that the Plaintiff took leave under the provisions under the FMLA and that she was later denied a leave benefit. The court finds that the conclusion that the element of causal connection has also been met is dictated by the Eleventh Circuit's *Brungart* decision. In *Brungart,* the court explained that a plaintiff must generally show that a decision maker was aware of the protected conduct at the time of the adverse action and stated that close temporal proximity is sufficient circumstantial evidence to create a genuine issue of fact as to causation. *See Brungart,* 231 F.3d at 799. These requirements are met here.

■ The court turns, therefore, to the explanation given by Barnes in his memorandum, recommending that the Plaintiff be denied advance sick leave, to determine if it is a legitimate non-discriminatory reason. In this memorandum, Barnes points out that the Plaintiff had taken FMLA leave. Barnes then states, "Because Ms. Bylsma has a history of poor attendance and has been on LWOP for a number of hours prior to the time of her father's illness and surgery, I regret that I cannot recommend approval of her request for advance sick leave." *See* Defendants' Exhibit 13–D. This evidence contains an express acknowledgment by Barnes that he considered that the Plaintiff had taken FMLA and does not provide any explanation as to why the taking of FMLA leave, as opposed to any other kind of leave, would be relevant to the denial of advance sick leave. While the Defendants have stated in brief that there was a concern that the Plaintiff would not be able to pay the advance leave back, that concern is not

---

4. The provision of the FMLA at issue provides
 a) Interference with rights
 (1) Exercise of rights
 It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
 (2) Discrimination
 It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

The Eleventh Circuit has indicated that the type of actions alleged in this case fall within this statutory provision. *See Brungart,* 231 F.3d at 798 n. 5 ("the substance of the FMLA provisions as they concern this case is that an employer may not do bad things to an employee who has exercised or attempted to exercise any rights under the statute. Asking for medical leave is exercising or attempting to exercise a right under the statute, and being fired is a bad thing.").

expressed in the memorandum written by Barnes in which he recommended that the leave benefit be denied. In addition, the court has been provided with an ADECA memorandum wherein the personnel manager states, "The only time I recall a request for advanced sick leave being denied was because the request did not meet the requirements for advance sick leave, for example at least five (5) consecutive days." Defendants' Exhibit 13–D. This is the only evidence the court has of the department policy on when advance sick leave would be denied. There has been no evidence provided to this court which indicates that the Plaintiff's leave request did not meet requirements for being given advance sick leave.

This claim presents a complicated issue of whether an employer can deny a leave benefit to an employee because that employee has used FMLA leave, even if denial of the benefit would not in and of itself violate the FMLA. The court has given careful consideration to the arguments advanced by the parties on this issue. While the court agrees that an employer must be able to decide when to afford an employment benefit that is not required by the FMLA, the court also finds that, under the facts in this case where the employer's explanation for why that benefit has been denied is that FMLA leave has been taken, where there is no explanation for why merely taking FMLA leave would warrant a denial of advance paid leave, and where there is unexplained evidence that normal department policy was not followed in denying the benefit, the employer has failed to articulate a legitimate non-discriminatory reason for its denial of the benefit. At trial, the Defendants may be able to offer evidence that will establish that Barnes' decision was based on more than the mere fact that the Plaintiff had taken FMLA leave, but this court must conclude, based on the memorandum provided to it, that the Defendants have failed to meet their burden at this stage in the proceedings. The court must conclude, therefore, that summary judgment is due to be DENIED as to this aspect of the Plaintiff's claim.

 There are other denials of leave which it appears the Plaintiff may be asserting are in retaliation for her FMLA leave. These denials of leave are also denials of benefits which it appears would not otherwise violate the FMLA. These include leave to attend the depositions taken in this case, and an oral warning in October 2000 for excessive absenteeism and placement of the Plaintiff on an action plan. It appears that the denial of leave to attend the depositions is not a separate act of retaliation, but is connected to the oral warning and action plan, because the Plaintiff was apparently denied leave to attend the depositions because it would violate her action plan. *See* Plaintiff's Deposition, pages 408, lines 17–21; Plaintiff's Brief in Response, page 13.

The Defendants' explanation for why the Plaintiff was warned and placed on an action plan is that she had exhausted all of her annual, sick, and FMLA leave and had to be placed on a plan so that she could begin to accumulate leave. Plaintiff's Deposition, page 244 (referring to a memo by Barnes).

The Plaintiff has argued in brief that she is the only employee who had been placed on an action plan. The Plaintiff has not, however, offered any evidence that there were other employees who had exhausted all of their annual, sick, and FMLA leave. Without such comparative evidence, the court cannot conclude that, just because the Plaintiff was the only employee placed on an action plan, the reason given for the plan is pretextual. *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir.2000)("absent some other similarly situated but differently disciplined worker, there can be no disparate treatment.").

The Plaintiff also states that she felt the oral warning and placement on the action plan were retaliatory because Barnes had been signing her leave slips and did not

say anything to her about it. Plaintiff's Deposition, page 242, lines 1–4. The court cannot conclude that the fact that Barnes had approved her to take leave undermines the veracity of the explanation that she was warned and placed on an action plan once her leave was exhausted. Accordingly, the court finds that the Plaintiff has failed to establish that the reason for her warning and placement on the action plan was a pretext for retaliation.[5] Summary judgment is, therefore, due to be GRANTED as to this aspect of the Plaintiff's FMLA claim.

Although addressed in the Defendants' list of the Plaintiff's contentions, the Defendants have not directly addressed in their motions all of the apparent bases for the Plaintiff's FMLA claim. In the conclusion section of her brief the Plaintiff states that her performance rating dropped from a 38 to a 17.5, she was denied training and access to information, has been excluded from supervisory staff and council meetings, her assistant supervisor duties have been removed, and that she has been subjected to harassment and humiliating comments and behavior because she accessed FMLA leave.

The court has discussed some of these purported adverse employment actions in connection with the First Amendment claims. The analysis of what can constitute an adverse employment action differs with regard to the FMLA retaliation claims, however, both because the retaliation must be linked to the Plaintiff's use of her FMLA leave, not her speech, and because the employer can be held liable for the actions of its employees under FMLA, unlike a § 1983 action which requires more than respondeat superior to hold an employer liable.

■■■ The Eleventh Circuit has decided a FMLA retaliation case and has, adopt-

ing the opinion of the district court, addressed what actions constitute adverse employment actions under the FMLA. *See Graham v. State Farm Mutual Ins. Co.,* 193 F.3d 1274 (11th Cir.1999). In the opinion adopted by the Eleventh Circuit, the listed examples of employment actions which constitute adverse employment actions under the FMLA include "undeserved negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment." *Id.* at 1283. It is within the context of these examples, therefore, that the court will evaluate the Plaintiff's evidence.

■■■ As was stated above, the Plaintiff claims that a performance rating of 17.5 was given to her in retaliation for taking FMLA leave. As earlier discussed, the court has found that there is sufficient evidence that this performance rating was an adverse employment action because it was much lower than an earlier score she received and had an affect on the amount of raise she could receive. The issue is whether there is a causal connection between this action and the Plaintiff's exercise of her rights under the FMLA. The Plaintiff took FMLA leave without pay to care for her sick mother in April of 1999 and took FMLA leave again in September 1999 to care for her sick father. According to the Defendants, between April of 1999 and September of 1999, the Plaintiff took 147.25 hours of unpaid, non-FMLA leave. In November of 1999, the Plaintiff asked for leave she had taken in October and November of 1999 to be advance sick leave, rather than unpaid FMLA leave. Her performance evaluation was also conducted in November of 1999.

As earlier stated, the Eleventh Circuit has explained that the general rule is that close temporal proximity between an employee's protected conduct and the adverse

---

5. Although not argued by the Plaintiff, the court further finds that the mere fact that Barnes had earlier denied advance sick leave is not sufficient to establish pretext with regard to his having placed the Plaintiff on an action plan a year later, after having approved the Plaintiff for additional leave, where there is no contention that he acted outside of state policy or any departmental practice.

employment action is sufficient circumstantial evidence to create a genuine issue of material fact of causal connection. *Brungart*, 231 F.3d at 799. The court finds, therefore, that there is sufficient evidence to establish the causal connection.

The Defendants have argued that because the 38 the Plaintiff had previously received on her evaluation was given by a different supervisor, Rodney Stephen Davis, and because different supervisors rate employees differently based on their own observations, the Plaintiff's evaluation of 17.5 was not retaliatory.

As earlier stated, the Defendants have conceded that Walkley and Barnes discussed the Plaintiff's evaluation. As noted in this court's earlier opinion entered in this case, in the Plaintiff's mid-term appraisal, Walkely stated that the Plaintiff needed "to improve attendance/leave so that when she needed leave, it is available." Defendants' Exhibit 14–F. The court has not been persuaded to alter its conclusion that this is some evidence that in evaluating her performance, Walkley took into account that she had taken FMLA leave without linking the taking of that leave to any deficiency in her performance. Although Walkley also noted that she had a problem with timely submitting her assignments, he does not expressly tie this to any attendance problems. The court concludes, therefore, that the Plaintiff may proceed on this theory.

 The Plaintiff also challenges the "20–Meets Standards" evaluation that she was given in November 2000. This claim presents a slightly different issue. Although the Plaintiff has convinced the court that a "Meets Standards" evaluation of 17.5 is an adverse employment action because it resulted in a smaller raise, the Plaintiff has not provided this court with any evidence as to the effect that a rating of 20 would have. This lack of evidence, and the fact that the 20 was an improvement over the 17.5, leads this court to conclude that the Plaintiff has failed to meet her burden of demonstrating that the

evaluation of 20 was a negative employment evaluation, so as to constitute an adverse employment action. *See Merriweather,* 17 F.Supp.2d at 1274.

The Plaintiff also challenges Barnes' request that she include additional information in her Summer 2000 monitoring report. The Plaintiff states that she had followed the same format Barnes had used earlier and the additional information required caused the Plaintiff to need additional time to complete her report. The Plaintiff made clear in her deposition, however, that she is not contending that Barnes did not actually want the information and was just creating work for her. Plaintiff's Deposition, page 236–37. Instead, she merely states she cannot understand why he would change the format. *Id.* at 239, lines 4–5. The court cannot conclude that this evidence is sufficient to establish, under an objective standard, that there was an adverse employment action taken.

The Plaintiff also challenges Barnes' allowing Doris Felder in October 2000 to turn in a monitoring report six months after the review was conducted. The Plaintiff explains that she was treated differently from Doris Felder because Doris Felder was not reprimanded or asked to request an extension as the Plaintiff was. The court cannot conclude that allowing another employee to turn a report in at a later date is separately actionable as an adverse employment action. Without deciding this question at this time, this evidence may be relevant to proving another of the Plaintiff's claims at trial.

The Plaintiff further claims that she did not attend the training she had attended the previous two years. The Defendants state that the Plaintiff has failed to identify any training or information to which she was denied access. The Plaintiff's primary response is that she does not know what training she has not been allowed to attend because she has not received the information regarding training. While the court

understands the Plaintiff's position, there must be some basis from which to conclude that some training opportunities were available in a temporally close period of time after she requested FMLA leave in order for there to be a causal connection between statutorily protected activity and an alleged adverse employment action. In other words, merely because the Plaintiff did not attend as much training as she had in the past does not mean that training was even available. The court will, therefore, focus on the training opportunities which have been identified by the Plaintiff.

In her deposition, the Plaintiff discusses some financial documents training, and some out of state trips taken by Barnes and Doris Felder for training, as well as training which occurred in Oklahoma. The Plaintiff states in her deposition that she wanted to go to the financial documents training, but that when she asked to go to that training, Barnes told her he wanted her to go to the forms training instead. Plaintiff's Deposition, pages 232–33. The Plaintiff states that she would have benefitted more from the financial training. *Id.* at 233, lines 3–4.

■ This court, and another judge in this district, have analyzed whether nonselection for a training course constitutes adverse employment action and have determined that for nonselection for training to be an adverse employment action, there must be a showing that the training would impact the plaintiff's employment. *See Merriweather,* 17 F.Supp.2d at 1270; *Bullock v. Widnall* 953 F.Supp. 1461, 1473 (M.D.Ala.1996), *aff'd,* 149 F.3d 1196 (11th Cir.1998). In *Bullock,* the plaintiff alleged that he was denied equal access to training courses in general and that in retaliation for the plaintiff's EEO complaints, one of the plaintiff's subordinates was selected to attend a certain course which provided training in management supervision skills. *Bullock,* 953 F.Supp. at 1466. The court found that the plaintiff had failed to show that his non-selection for the training course was an adverse employment action

because the plaintiff did not demonstrate that his non-selection "would affect his salary, chances of promotion, ability to perform his job, etc." *Id.* at 1473. The court also concluded that it was not sufficient to establish an adverse employment action that the plaintiff may have benefitted from attending the training. *Id.*

In this case, there is no evidence that the Plaintiff's employment was at all affected by her not having the financial documents training. The court cannot conclude, therefore, that this decision by Barnes to send the Plaintiff to one training session over another was an adverse employment action.

The Plaintiff states that she knows that Barnes and Doris Felder have been to training that she was not aware of and that in the past her supervisor would have told her he wanted her to go to particular training. Plaintiff's Deposition pages 233–34. The court simply cannot conclude from this evidence that the Plaintiff was denied training needed for her employment so as to establish that an adverse employment action was taken against her.

Similarly, as to the training session in Oklahoma, the Plaintiff actually was approved to go, but she states that she missed the deadline for processing her travel documents. Plaintiff's Deposition, page 234. When asked if she had evidence that the paperwork was withheld to keep her from attending the training, she answered no. *Id.* at page 235, lines 9–12. Again, there is also no evidence that this training would have impacted the Plaintiff's employment. The court concludes, therefore, that summary judgment is due to be GRANTED as to all of the Plaintiff's theory that she was retaliated against because she was denied training.

■ The Plaintiff also asserts that she was denied attendance at staff meetings. The Defendants point out that during her deposition the Plaintiff failed to identify any staff meetings to which she was denied attendance. They contend that she has

only pointed to supervisory staff meetings. The Plaintiff argues that she was performing supervisory duties when she was not designated a supervisor and that she needed to attend supervisory meetings to perform her duties.

The court has, viewing all evidence in the light most favorable to the Plaintiff and drawing all inferences in favor of the Plaintiff, decided that the removal of supervisory duties from the Plaintiff, even though she was not authorized to be designated as a supervisor, does not constitute an adverse employment action in this case because there is no evidence that she suffered any consequences as a result of no longer performing those functions. Similarly, the court must conclude that the same reasoning precludes finding as an adverse employment action the denial of attendance to supervisory meetings for the purpose of performing supervisor functions to a person who was not designated as a supervisor.

In addition, to the extent that the Plaintiff claims that she was denied attendance at other meetings, such as council meetings, or that she was not provided full information, she has not demonstrated that her non-attendance or that the lack of access to particular information had any effect on her salary or benefits. *Cf. Merriweather,* 17 F.Supp.2d at 1270.

The Plaintiff has also contended that Walkley harassed and belittled her. As earlier stated, the Plaintiff has stated in her deposition testimony that Walkley used Barnes to harass and belittle her. Plaintiff's Deposition, page 327. She has also presented evidence of a conversation during which Walkley threatened her. The court does not find in the evidence provided to it evidence of harassment and belittlement which is substantial enough to constitute an adverse employment action. *See Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453 (11th Cir.1998).

The Plaintiff also states that the reorganization of the ADECA Workforce Development Division on October 4, 1999 which moved Barnes into the section supervisor position adversely affected her because Walkely has used Barnes to effect his retaliatory and harassing acts. The court cannot find that this evidence is sufficient to establish that an adverse employment action was taken against the Plaintiff when she has not disputed that the reorganization affected not just the Plaintiff, but 60 employees at ADECA. The court concludes, therefore, that the Plaintiff's retaliation theories are limited to the denial of advance sick leave and her lowered performance evaluation.

Having found that the Plaintiff can proceed on some aspects of her FMLA claim, the court must now address the constitutional question of whether Congress validly abrogated the States' Eleventh Amendment immunity in the FMLA. If the court concludes that Congress did not so validly abrogate the State's immunity, then the remedy available to the Plaintiff on her FMLA claim, like her § 1983 First Amendment claim, will be limited to prospective injunctive relief.

Generally, a state is immune from suit by an individual without its consent. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Congress can, however, give citizens a right of action for damages against an unconsenting state if Congress has unequivocally expressed its intent to abrogate the immunity, and if Congress has acted pursuant to a valid exercise of power. *Id.* at 55, 116 S.Ct. 1114. The States' sovereign immunity can be abrogated by Congress pursuant to its enforcement power under Section 5 of the Fourteenth Amendment. *Id.*

The Defendants have argued that although Congress purported to abrogate the State's Eleventh Amendment immunity when it passed the FMLA, Congress acted outside of its authority in so doing. In support of this argument, the Defendant cites this court to a decision of the Fifth Circuit Court of Appeals in which

that court held that Congress did not validly enact subsection (C) and (D)[6] of the FMLA pursuant to its enforcement power under Section 5 of the Fourteenth Amendment. *Kazmier v. Widmann,* 225 F.3d 519, 527–29 (5th Cir.2000).

Before turning to the issues raised in the briefs, there is an initial issue which has not been addressed by the parties or by the United States. Some circuit courts of appeals have determined that Congress did not validly abrogate Eleventh Amendment immunity under the FMLA as a whole. *See Sims v. The University of Cincinnati,* 219 F.3d 559 (6th Cir.2000); *Townsel v. Missouri,* 233 F.3d 1094, 1095 (8th Cir.2000). The Eleventh Circuit Court of Appeals, however, when addressing whether Congress validly abrogated the states' immunity under the FMLA, focused its analysis on the provision at issue which, in that case, was the provision allowing for leave for one's own medical problems. *See Garrett v. The University of Alabama at Birmingham Board of Trustees,* 193 F.3d 1214 (11th Cir.1999), *cert. granted on another issue sub nom,* 529 U.S. 1065, 120 S.Ct. 1669, 146 L.Ed.2d 479 (2000). The Eleventh Circuit concluded that Congress did not have the authority to abrogate the sovereign immunity of the states on claims arising under leave provision for an employee's own medical needs. *Id.* at 1220.

This court is bound by the *Garrett* decision to examine the particular FMLA provision at issue to determine whether immunity has been validly abrogated. In the cases addressed in the briefs, such as *Kazmier,* in which the courts were addressing particular portions of the FMLA, the courts addressed the provisions regarding care of family members and/or the care of one's self. In this case, the Plaintiff asserts a claim under the FMLA retaliation provision. The Plaintiff is, however, claiming that she was retaliated against for having exercised her right to take FMLA leave to care for family members. Accordingly, this court concludes that the question of the validity of Congress' abrogation of the States' Eleventh Amendment immunity under the retaliation provision is tied to the question of the validity of abrogation of the FMLA provision regarding leave to care for family members. *See Hale v. Mann,* 219 F.3d 61 (2nd Cir.2000)(analyzing together the retaliation and related leave provisions in examining the abrogation of immunity).

The United States has intervened in this case, at the invitation of the court, and has argued that this court should not follow any of the decisions of the Circuit Courts of Appeals and should instead determine that the family leave portions of the act are sections for which Congress validly abrogated the State's Eleventh Amendment immunity. Although the court is not aware of any courts of appeals adopting the United States' position, there is at least one district court case which has so held. *See Serafin v. Connecticut Dept. of Mental Health and Addiction Services,* 118 F.Supp.2d 274 (D.Conn.2000)(Congress validly abrogated immunity under the provision for care of sick family members).

According to the United States, the FMLA is remedial and preventive legisla-

---

6. The FMLA provides

an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period for one or more of the following:
(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612.

tion because Congress found that employers deny family leave to men and work opportunities to women, which Congress sought to prevent through the FMLA. The United States argues that Congress can redress constitutional violations in forms other than mere prohibition. The United States further argues that this court need not examine the legislative record because the question is not whether an adequate legislative record was created, but rather whether it appears that the statute in question can be characterized as legitimate remedial legislation.

In *Garrett*, the Eleventh Circuit first expressed doubt, but did not decide, whether there was adequate language to convey an intent by Congress to abrogate Eleventh Amendment immunity under the FMLA since there was an absence of the kind of clear language found in other statutes. *Id.* at 1219. Although not deciding this issue, the court pointed out that similar analysis was conducted by a judge in *Kimel v. State Bd. of Regents*, 139 F.3d 1426 (11th Cir.1998), which was pending on writ of certiorari before the United States Supreme Court. *Id.* Subsequent to the *Garrett* decision by the Eleventh Circuit, the Supreme Court, in *Kimel*, determined that the language in the ADEA indicating that claims for damages were to be allowed against employers including state agencies was sufficient to indicate an intent to abrogate the state's Eleventh Amendment immunity. *Kimel v. Florida Board of Regents*, 528 U.S. 62, 75–76, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

Because the language in the FMLA is similar to the language in the ADEA, the court concludes that there is adequate evidence of intent to abrogate the states' Eleventh Amendment immunity. *See also Sims*, 219 F.3d at 562. The remaining question, therefore, is whether Congress had the authority to abrogate the sovereign immunity of the states under the relevant provision.

In an area where the discrimination to be remedied is based on gender, Congress has wide latitude to enact prophylactic legislation. *See Kazmier*, 225 F.3d at 526. Congress' power is not unlimited, however. *See City of Boerne v. P.F. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Congress may not enact measures that make a substantive change in governing law. *Id.* at 520, 117 S.Ct. 2157. This court agrees with the *Kazmier* court that there is nothing in the Constitution that requires employees to be given twelve weeks of leave to care for ailing family members. *Kazmier*, 225 F.3d at 526. This court concludes, therefore, that the twelve weeks of leave provision for care for family members is a substantive change which is out of proportion to the remedial or preventive object. *See City of Boerne*, 521 U.S. at 532, 117 S.Ct. 2157. Accordingly, the court follows the holding of the *Kazmier* court that Congress did not make sufficient findings to validly abrogate Eleventh Amendment immunity under this provision of the FMLA. *See Kazmier*, 225 F.3d at 526. Therefore, while the Plaintiff may proceed on her FMLA claim, she is limited to seeking prospective injunctive relief.[7]

### V. CONCLUSION

As the court has indicated, there remain in this case disputes of fact which are sufficient to defeat the Motion for Summary Judgment as to some aspects of the Plaintiff's First Amendment and FMLA claims. As has been discussed, if the Plaintiff ultimately prevails on her claims, she will only be entitled to prospective injunctive relief.

Accordingly, for the reasons discussed, it is hereby ORDERED as follows:

1. The Defendants' Second Renewed Motion (Doc. # 29) is DENIED as to the

---

7. Because the Plaintiff is only entitled to prospective injunctive relief, the court has not discussed the evidence presented of the Plaintiff's medical treatment which she contends was a result of the actions taken by the Defendants.

Plaintiff's First Amendment claim of retaliation in the form of a lowered performance evaluation and on her FMLA claim of retaliation in the form of a lowered performance evaluation and denial of advance sick leave. The Motion is GRANTED in all other respects as to the First Amendment and FMLA claims and judgment is entered in favor of Steve Walkley and Nick Bailey in their official capacities accordingly.

2. The Defendants' Motion for Reconsideration (Doc. # 15) is GRANTED.

The case will proceed on the Plaintiff's First Amendment claim of retaliation in the form of a lowered performance evaluation and on her FMLA claim of retaliation in the form of a lowered performance evaluation and denial of advance sick leave.